# JOHNSON *v.* UNITED STATES.

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 1075.   Argued May 1, 2, 1912.—Decided June 7, 1912.

Whether the prisoner was properly arraigned is not a matter of form but of substance, and should be shown by the record. *Crain* v. *United States,* 162 U. S. 625.

There is no explicit provision in the laws of the United States describing what shall constitute an arraignment; but so far as it is expressed it has a definite meaning.

Where a word is used as comprehensively descriptive of certain acts, it can be used in the record of a case as showing the performance of those acts; and so *held* as to "arraignment" as used in § 1032, Rev. Stat.

In this case what was done, as shown by the record, did constitute an arraignment.

The record in a case imports verity and cannot be contradicted by affidavits. *Evans* v. *Stettnisch,* 149 U. S. 605.

As used to define the place where a crime may be committed the words, "within any fort, arsenal, dockyard, magazine, or any other place or district of country under the exclusive jurisdiction of the United States" include the District of Columbia.

The act of January 15, 1897, 29 Stat. 487, c. 29, permitting the jury in a capital case of murder or rape under § 5339 or § 5345, Rev. Stat., to qualify the verdict by adding "without capital punishment" was applicable to the District of Columbia until superseded by the special provisions on the same subject in the District Code. *Winston* v. *United States,* 172 U. S. 303.

In framing a new statute a change of language from that of a former statute on the same subject is some evidence of a change of legislative purpose.

Some of the provisions of the Criminal Code approved March 4, 1909, 35 Stat. 1088, c. 321, apply to the District of Columbia and other provisions do not.

Congress in enacting the District Code recognized the expediency of separate provisions for the District of Columbia.

The provisions of the Criminal Code which deal with offenses Federal in nature, wherever committed, whether in places under Federal,

state or territorial control, supersede the District Code; provisions, however, in regard to offenses under state jurisdiction if committed in a State or over which Congress has given local control to the Territories, and in regard to which it has adopted a separate code as for Alaska, do not supersede the District Code.

The provision in § 272 of the Criminal Code of 1909 permitting the jury to qualify the verdict of guilty in certain cases punishable by death by adding "without capital punishment" does not supersede the provisions in the District Code in regard to. punishment for murder.

Provisions in earlier statutes in regard to matters which are embraced in and superseded by a later statute are repealed by the later statute; but where the two statutes have definite territorial operation, they can exist together and the earlier one is not repealed or affected by the later.

An objection that the jury was not lawfully drawn must be availed of at the trial; it cannot, under § 919 of the District Code, be made the basis for setting aside the verdict on appeal.

38 App. D. C. 347, affirmed.

THE facts, which involve the validity of a conviction and sentence for murder in the District of Columbia, are stated in the opinion.

*Mr. Paca Oberlin* and *Mr. Thomas M. Baker* (by special leave of the court), with whom *Mr. Joseph Salomon* was on the brief, for petitioner:

A defendant in a capital case cannot waive anything essential. *Crain* v. *United States*, 162 U. S. 625. See, also, *Hill* v. *People*, 16 Michigan, 351; *Cancemi* v. *People*, 18 N. Y. 128.

Reading of an indictment is necessary in all criminal cases unless waived and in a capital case it cannot be waived, and the record in such a case which is silent on that point is the same in legal effect as if it recited that reading was waived, or indictment not read, and if either be true the record is fatally defective. *Crain* v. *United States, supra.*

In capital and other infamous crimes both the arraign-

ment and plea have always been regarded as a matter of substance and must be affirmatively shown in the record. *Crain* v. *United States, supra.* This is so well established that the condition should not be disturbed. Informed of the nature of the offense means reading the indictment.

Section 330 of the Criminal Code, authorizing the jury, in capital cases, to add to their verdict "without capital punishment," applies to the District of Columbia.

Prior to January 1, 1902, the date the District Code became effective, § 5339, Rev. Stat. was the statute under which the offense of murder was prosecuted. *Winston* v. *United States,* 172 U. S. 303; *United States* v. *Guiteau,* 1 Mack. 498.

An act entitled "An act to reduce the cases in which the death penalty may be inflicted," approved January 15, 1897, 29 Stat. 487, was held to be in force in the District of Columbia. *Winston* v. *United States, supra.*

The District Code, in §§ 798, 799, 800, prescribes what constitutes murder in the first and second degrees. Section 801 prescribes that punishment of murder in the first degree shall be death by hanging, and that of murder in the second degree, imprisonment for life or for not less than twenty years.

Section 272 of the Criminal Code is, in part, substantially a reënactment of that portion of § 5339, Rev. Stat., as to the commission of murder in any "place or district of country under the exclusive jurisdiction of the United States"; two degrees of murder are provided for in both the District Code and Criminal Code; and the language of § 330 of the Criminal Code is almost identical with that of the act of January 15, 1897, which was held to be in force in the District of Columbia.

Inconsistency between § 330 of the Criminal Code and previous statutes, for the purpose of preventing that section from being in force in the District, must be such as clearly exhibits an intent on the part of Congress not to

give the people of the National Capital the benefits of the law.

From early times it has been true that whenever there was a statute in favor of life or liberty that construction has been adopted by the courts which would cause it to operate in all places where it could so operate. A general act, prescribing the punishment of a specific offense throughout the State, operates as a repeal of a public local act prescribing a different punishment for a particular locality. *Nusser* v. *Commonwealth*, 25 Pa. St. 126; *People* v. *Jaehne*, 103 N. Y. 182.

An act changing the punishment only is not inconsistent with a failure to modify the elements of the crime also, especially when the punishment is made less. *Commonwealth* v. *Wyman*, 12 Cush. 237.

The rule of construction by which general acts of Congress are held to be applicable to the District of Columbia has been followed from the beginning. The Criminal Code contains nothing to indicate that this rule should be departed from.

Section 209 of the District Code, which expressly excepts capital cases, is the only provision in that code for the drawing of juries in criminal cases. The former acts of Congress regulating the selection of petit juries were repealed by the Code and § 209 is therefore the only statutory authority for completing juries; and as it expressly excepts capital cases the completing of the jury according to its provisions was reversible error.

*The Solicitor General* for the United States.

MR. JUSTICE McKENNA delivered the opinion of the court.

Johnson was indicted, tried and convicted in the Supreme Court of the District of Columbia for the crime of murder for killing one Ofenstein, and sentenced to death.

He moved for arrest of judgment and for new trial on certain grounds which, among others, present three questions—(1) whether he had been properly arraigned; (2) the action of the court in giving and refusing instructions in regard to the power of the jury to add to their verdict, if they found him guilty of murder, the words "without capital punishment"; (3) the legality of the manner of selecting the jury.

(1) The record recites the presence of the attorney for the United States, the defendant in proper person and by his attorney, and adds that "thereupon the defendant being arraigned upon the indictment pleads thereto not guilty and for trial puts himself upon the country, and the attorney of the United States doth the like."

The contention is that there is a fatal defect in that the record does not show that the indictment was read to the defendant, and to establish that such reading was necessary counsel invoke the Sixth Amendment of the Constitution of the United States, which provides, among other things, that in all criminal prosecutions the accused shall be informed of the nature and cause of the action against him. But to this it may be urged, as it is urged, that information of the charge may be given without reading the indictment. But we may pass that, and grant also that in capital and otherwise infamous crimes both the arraignment and plea are a matter of substance, and must be affirmatively shown by the record. We think that they are shown if such be the fair intendment of the words of the record. And this is demonstrated by the case that is relied on against it, that is, *Crain* v. *United States*, 162 U. S. 625. In that case the record did not show (and we quote from the opinion, p. 636) "that the accused was ever formally arraigned, or that he pleaded to the indictment," except as an inference from a statement in the bill of exceptions that the jury were "sworn and charged to try the issues joined." It was held, after elaborate dis-

cussion, three members of the court dissenting, that a plea to the indictment was not a matter of form, but of substance, and should be shown by the record. In the discussion and in the cases cited the arraignment was considered as distinct from the plea and consisted of formally calling the accused to the bar for the purpose of a trial. We may quote as illustrative the following paragraph from pages 637, 638:

"According to Sir Matthew Hale, the arraignment consists of three parts, one of which, after the prisoner has been called to the bar, and informed of the charge against him, is, the 'demanding of him whether he be guilty or not guilty; and if he pleads not guilty, the clerk joins issue with him *cul. prist*, and enters the prisoner's plea; then he demands how he will be tried, the common answer is, *by God and the country*, and thereupon the clerk enters *po. se*, and prays to God to send him a good deliverance.' 2 Hale's Pl. Cr. 219. So, in Blackstone: 'To arraign is nothing else but to call the person to the bar of the court to answer the matter charged upon him in the indictment.' 'After which [after the indictment is read to the accused] it is to be demanded of him whether he is guilty of the crime whereof he stands indicted, or not guilty.' 4 Bl. Com. 322, 323 to 341. Chitty says: 'The proper mode of stating the arraignment on the record is in this form, "and being brought to the bar here in his own proper person, he is committed to the marshal, etc. And being asked how he will acquit himself of the premises (in case of felony, and of 'the high treasons' in case of treason) above laid to his charge, saith," etc. If this statement be omitted, it seems the record will be erroneous.' 1 Chitty's Cr. Law,* 419.''

There is no explicit provision in the laws of the United States describing what shall constitute an arraignment. But so far as it is expressed it has a definite meaning. By § 1032 of the Revised Statutes it is provided that

"when any person indicted for any offense against the United States, whether capital or otherwise, upon his *arraignment* stands mute, or refuses to plead or answer thereto, it shall be the duty of the court to enter the plea of not guilty on his behalf, in the same manner as if he had pleaded not guilty thereto. And when the party pleads not guilty, or such plea is entered as aforesaid, the cause shall be deemed at issue, and shall, without further form or ceremony, be tried by a jury."

It will be observed that the word "arraignment" is used as comprehensively descriptive of what shall precede the plea. If it be so used in the law, it certainly can be used in the record as showing the performance of that which the law prescribes by it. We realize that both the Constitution and the law are careful to direct that information be given to the accused of the charge against him. By § 1033 it is provided that when any person is indicted for any capital offense, if it be treason, three days before the trial, and if it be any other capital offense, two days before the trial, a copy of the indictment and list of jurors and witnesses shall be delivered to him. And this can be insisted on. *Logan* v. *United States*, 144 U. S. 263; *Hickory* v. *United States*, 151 U. S. 303. We may presume that the law was complied with in the present case and that Johnson was given a copy of the indictment as well as having had it read to him, which we think the record sufficiently shows; and as the record imports verity it cannot be contradicted by an affidavit which counsel filed in the case, even if it had been filed for such purpose, which, according to counsel, it was not, but "to call the attention of the court to the defect on the face of the record." *Evans* v. *Stettnisch,* 149 U. S. 605, 607.

(2) Prior to January 15, 1897, homicide, as a crime against the United States was divided into murder and manslaughter "when committed within any fort, arsenal, dock-yard, magazine, or in any other place or district of

country under the exclusive jurisdiction of the United States," and upon the high seas and certain waters out of the jurisdiction of any particular State. The punishment for murder was death; for manslaughter, a certain term of imprisonment. Sections 5339, 5340, 5343. The crime of rape, when committed in any of the specified places, was also punished by death. Section 5345.

By the act passed January 15, 1897, it was provided "that in all cases where the accused is found guilty of the crime of murder or of rape under section fifty-three hundred and thirty-nine or fifty-three hundred and forty-five, Revised Statutes, the jury may qualify their verdict by adding thereto 'without capital punishment'; and whenever the jury shall return a verdict qualified as aforesaid, the person convicted shall be sentenced to imprisonment at hard labor for life." 29 Stat. 487, c. 29. It will be observed that § 5339 of the Revised Statutes is made part of the act. By that section, reënacting earlier acts of Congress, "every person who commits murder" "within any fort, arsenal, dockyard, magazine, or in any other place or district of country under the exclusive jurisdiction of the United States, shall suffer death." The act was held applicable to the District of Columbia, and under its provisions and § 5339 until January 1, 1902, the date when the District Code became effective, murder was prosecuted. *Winston* v. *United States*, 172 U. S. 303.

By the District Code murder was divided into two degrees, and it was provided that the punishment for murder in the first degree should be "death by hanging." Punishment for manslaughter was fixed at imprisonment for life, or for not less than twenty years. Sections 798, 799 (this section made it murder in the first degree to put obstructions on a railroad or street railroad), 800 and 801.

The District Code also changed the law as to rape and fixed its punishment at not less than five nor more than thirty years, the jury having the power to add to their

verdict, if it be guilty, the words "with the death penalty." Section 808.

It necessarily followed that the provision for the qualified verdict ceased to apply in the District. Thereafter the definitions and requirements of the District Code prevailed and the death penalty was imposed for conviction of murder in the first degree for eight years.

In the meanwhile a commission was at work revising and codifying the criminal and penal laws of the United States, with the result that a Criminal Code was approved March 4, 1909, 35 Stat. 1088, c. 321. It is the asserted clash between its provisions giving power to the jury to qualify their verdict and those of the District Code under which, we have seen, the jury has not such power, that constitutes the question in this case.

That some provisions of the Criminal Code are applicable to the District, is conceded. It is conceded by the Government that the first ten chapters are applicable just as they are to the States, Territories and other districts, and that the same is true of chapter 12. The concession is put upon the ground that those chapters deal with offenses Federal in their nature. Chapter 13, it is said, relates to territorial jurisdiction and deals with certain offenses "'when committed within any Territory or district, or within or upon any place within the exclusive jurisdiction of the United States.'" So far as the District Code deals with the offenses described in chapter 13, it is superseded by the Criminal Code.

The Government says: "There seems to be no room for doubt of this. The offenses defined are to be punished as prescribed 'when committed within any Territory or district, or within or upon any place within the exclusive jurisdiction of the United States.' Sec. 311. The District of Columbia comes within this description. Then we find in § 319 that 'the provisions of this section shall apply only within the Territories of the United States,' and in

§ 320 that 'the provisions of this section shall apply only within the Territories of the United States and the District of Columbia.'"

The final concession of the Government, therefore, is that "it cannot be said broadly that in the enactment of the Criminal Code there was no purpose to deal with or modify the District Code in any respect." But the Government turns from these concessions and insists that chapter 11, in which murder is defined, was not intended to apply to the District. This is deduced from the report of the commission and § 272 of the chapter which defines the territorial extent and the application of the chapter. The commission in their report said: "In the revision of this chapter we have deemed it important to define with the greatest attainable precision the places within which the jurisdiction of the United States over crimes shall be exercised."

They adopted a definition by an enumeration of places. Among others, the following: "Any fort, arsenal, dockyard, magazine, other needful building, structure, reservation, or other place under the exclusive jurisdiction of the United States."

But the suggested definition was amended by the joint committee of Congress and became § 272 of the Criminal Code, which is less broad than the provision recommended by the commission. That section provides: "The crimes and offenses defined in this chapter [11] shall be punished as herein prescribed. . . . Third. When committed within or on any lands reserved or acquired for the exclusive use of the United States, and under the exclusive jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building." The difference to be observed between this provision and that recommended by the commission is the

difference between "any fort . . . or other place under the exclusive jurisdiction of the United States," and "any lands reserved or acquired for the exclusive use of the United States, and under the exclusive jurisdiction thereof." The word "lands" in the latter is limited, as the word "place" was in the former, by its association. It is further limited and, indeed, specialized by the qualification "reserved or acquired for the exclusive use of the United States." In other words, it has a proprietary and not a governmental sense, and is very inapt, indeed, to describe the District of Columbia.

This view is reinforced by a comparision of § 272 with §§ 5339 and 5570 of the Revised Statutes, which preceded it, and of which it was intended to take the place. Section 5570 was the predecessor of the fourth subdivision of § 272, and we have no concern with it. The other three subdivisions were preceded by § 5339, which provided as follows: "Every person who commits murder—First. Within any fort, arsenal, dock-yard, magazine, or in any other place or district of country under the exclusive jurisdiction of the United States;

"Second. . . .

"Third. . . . shall suffer death."

It will be observed, therefore, how general and comprehensive the first clause of § 5339 is, and in comparison how restricted and special is subdivision three of § 272. In other words, there is omitted from the latter the words by which, we have seen, it was decided in *Winston* v. *United States, supra,* that the act of January 15, 1897, *supra,* which was the first legislation giving the power to a jury to qualify their verdict, was applicable to the District of Columbia.

A change of language is some evidence of a change of purpose, and certainly it could not have been supposed that the words "any lands reserved or acquired for the exclusive use of the United States," used in § 272, would

be regarded as the equivalent in meaning of the words "district of country under the exclusive jurisdiction of the United States," used in § 5339. And yet it is mainly on those words in § 272 that appellant relies. The District of Columbia can hardly be said, as we have pointed out, to be in any proper or adequate sense "lands reserved for the exclusive use of the United States," while the words "district of country under the exclusive jurisdiction of the United States" can be, as they had been, properly and adequately held to include the District of Columbia.

Very little comment is necessary to show the purpose of the restricted language of § 272. Chapter 11 deals, as said by the Government, with offenses of the kind subject to the jurisdiction of the States severally where there are States—offenses not distinctively Federal in character, but subjects of local or domestic police. The Territories provided their own laws in such cases, just as the States did, and there were distinct congressional enactments for Alaska and the District of Columbia which were not intended, we think, to be disturbed. This conclusion gets strength from § 289, which provides that if any act be done or omitted in any of the places mentioned in § 272 which is not made penal by a law of Congress but is penal "within the territorial limits of any State, recognized Territory or District," shall remain penal notwithstanding a "subsequent repeal or amendment thereof by any such State or Territory or District."

It follows, therefore, we think, that chapter 11 of the Criminal Code, and necessarily § 272, which is a part of it, are not applicable to the District of Columbia. And it is an immediate inference that if the chapter defining the crime of murder is not applicable, chapter 14, which deals with its trial and incidents, may not be applicable. There are circumstances which confirm the inference.

In chapter 11 the definition of murder is essentially the same as in the District Code, though there are some

difference in the manner of expression. It is divided into murder in the first degree and murder in the second degree, and in both the punishment is death, the District Code providing the manner of death to be by hanging, as does the Criminal Code in § 323 of chapter 14.

The punishment for murder in the second degree is different in the different codes. In the District Code it is imprisonment for life or for not less than twenty years; in the Criminal Code, for life or for not less than ten years. The punishments for manslaughter are also different, being for not more than ten years in the Criminal Code and not exceeding fifteen years in the District Code, or such imprisonment and a fine not exceeding one thousand dollars.

This brings us to the consideration of chapter 14, of which it may be said that most of its sections are continuations of the sections of the Revised Statutes or of former acts of Congress. For instance, § 330, which provides for the qualified verdict, is the same as the act of January 15, 1897, c. 29, § 1, 29 Stat. 487, except that the words "murder in the first degree" are added.

Further comparisons of the sections and provisions of the codes will not help us to clarify the situation, which, it must be admitted, lends itself to controversy.

We think, however, that there are certain general considerations which control. The codes are separate instruments, and no certain test can be deduced from pointing out particular likenesses or differences. But the effect of separation is important and necessarily had its purpose. The codes had in the main special spheres of operation and provisions accommodated to such spheres. There is certainly nothing anomalous in punishing the crime of murder differently in different jurisdictions. It is but the application of legislation to conditions. But if it be anomalous, very little argument can be drawn from it to solve the questions in controversy. The difference

existed for a number of years between the District and other places under national jurisdiction, for, as we have seen, the qualified verdict has not existed in the District since the enactment of the District Code, and did not exist when the Criminal Code was enacted. There is certainly nothing in the mere act of enacting that code which declares an intention to give to the provision conferring power on a jury to qualify their verdict greater efficacy against the code of the District than the same provision in the act of January 15, 1897, possessed. And the difference between that act and the District Code we cannot assume was overlooked and all that it meant in the administration of criminal justice when Congress came to review the laws of the country for the purpose of their codification and necessarily the territorial extent of their operation.

Congress certainly in enacting the District Code, recognized the expediency of separate provisions for the District of Columbia. It was said at the bar and not denied that the District Code was not only the work of the lawyers of the District, having in mind the needs of the District, but of its citizens as well, expressed through various organizations and bodies of them. In yielding to the recommendations Congress made no new precedent. It had given local control to the Territories, and it enacted a separate code for Alaska.

But it is said that Congress recognized the incompleteness of the District Code, and provided that all inconsistent acts of Congress passed thereafter should be held to modify its provisions, and to support this § 1639 is cited. That section provides as follows:

"The enactment of this code is not to affect or repeal any act of Congress which may be passed between the date of this act and the date when this act is to go into effect; and all acts of Congress that may be passed hereafter are to have full effect as if passed after the enactment

of this code, and, so far as such acts may vary from or conflict with any provision contained in this code, they are to have effect as subsequent statutes and as repealing any portion of this act inconsistent therewith."

In connection with this section, § 341 of the Criminal Code is referred to, which is as follows:

"Also all other sections and parts of sections of the Revised Statutes and acts and parts of acts of Congress, in so far as embraced within and superseded by this act, are hereby repealed; the remaining portions thereof to be and remain in force with the same effect and to the same extent as if this act had not been passed."

This section adds no force or explanation to § 1639. Of course, what was "embraced within and superseded by" the Criminal Code is repealed by it. But we have to consider, as we have considered, whether the provision of the District Code in regard to the punishment of murder were embraced within the Criminal Code, and the discussion answers as well the contention based on § 1639. There is no inconsistency of superseding or repealing effect between the Code of the District and the Criminal Code, regarding the latter as an act of Congress passed after the District Code. Having definite territorial operation, they can exist together. And, as said by the Court of Appeals, a cogent reason for the conclusion that they were intended to exist together is found in the repealing provisions of the Criminal Code, which, in chapter 15, enumerates in detail the provisions repealed, and no reference is made to the District Code.

(3) The last contention of petitioner is that the jury was not lawfully drawn. This contention is made as a make-weight at the last minute. It was not made as a ground for new trial or arrest of judgment, nor was it assigned as error in the Court of Appeals. The contention has the broad basis, according to the argument of petitioner, that there is no way of impaneling jurors in a

capital case in the District of Columbia without assenting to or dissenting from the proposition. We think it constituted a ground of objection to the competency of the jurors when they were called, and should have been availed of at the trial. It is provided by § 919 of the District Code that no verdict shall be set aside for any cause which might be alleged as ground of challenge before a juror is sworn, except for disqualifying bias not discovered or suspected by the defendant or his counsel before the juror was sworn.

*Judgment affirmed.*