UNITED STATES, Appellee

v.

STEPHEN MASUSOCK, Private, U. S. Army, Appellant

1 USCMA 32, 1 CMR 32

No. 15

Decided November 9, 1951

Lt. Col. George E. Mickel, USA, for Appellant.

Maj. Augustus A. Marchetti, USA, and 1st. Lt. Eugene L. Grimm, USA, for Appellee.

## Opinion of the Court

George W. Latimer, Judge:

Private Stephen Masusock, the petitioner, was tried before a general court-martial and was found guilty of being absent without leave from January 1, 1951 to March 7, 1951, in violation of Article of War 61. He was sentenced to dishonorable discharge, forfeiture of all pay and allowances, and confinement at hard labor for ten years. The sentence was approved by the convening authority and affirmed by a board of review. Pursuant to the provisions of Article 67, Uniform Code of Military Justice, 1950 (Act of May 5, 1950, 64 Stat. 108; 50 U.S.C. §§ 551–736), accused petitioned this court for a grant of review. We granted the petition to clear up the uncertainty surrounding the competency of morning reports when they are not executed by the commanding officer.

The petitioner was a member of K Company, 31st Infantry, 7th Infantry Division which at the time of the claimed absence was located in Korea. The evidence relied on by the government to establish the unauthorized absence was principally documentary, namely, extract copies of the morning report of K Company. The original reports were signed by First Lieutenant John P. Burdish as Personnel Officer of the 31st Infantry Regiment and not as Commanding Officer of K Company of that regiment. The petitioner claims this is contrary to the express provisions of the Department of Army Regulation then in effect and therefore the extract copies were hearsay and could not be used as the basis for a conviction. If we were to sustain this contention that the exhibits were inadmissible the evidence is insufficient to sustain the finding of guilt as there is no other evidence to establish the absence.

We are met at the threshold of this case with trial and appellate procedural

infirmities. When the exhibits were offered in evidence counsel for the accused was asked if there was any objection and he stated there was none. Their incompetency was raised for the first time on appeal before the board of review. In this connection, and under the new procedure of 1951 which requires that defense counsel be an attorney admitted to practice before a state or federal court, we adopt and follow the rule announced by the federal courts in those cases where error is asserted for the first time on appeal. The rule is well stated in Smith v. United States, 173 F. 2d 181, 184 (1949, 9th Cir.) as follows:

"It is without question true that in a criminal case the ultimate issue is the guilt or innocence of the accused, to be determined by a fair trial and not the competency of counsel, but it cannot serve the purpose of justice to permit a defendant to prosecute one theory in the trial court and, finding it unsuccessful, not only to substitute another on appeal but to claim error arising out of that which he himself has invited. The admitted normal rule is that an appellate court will not consider matters which are alleged as error for the first time on appeal, and this is true of criminal as well as civil cases. However, an exception exists in criminal cases where the alleged error would result in a manifest miscarriage of justice, or would 'seriously affect the fairness, integrity, or public reputation of judicial proceedings.'" [Citing United States v. Atkinson (1936) 297 U. S. 157, 160.]

As will more fully appear in later portions of this opinion, the crux of petitioner's argument goes to the delegation of authority by the commanding officer of the company. Had this question been made an issue while the trial was in progress the true facts could have been produced with little or no difficulty. After the trial has been completed, and the matter is before us on review, there is no legal way of adding to or subtracting from the record made during the course of the trial. There-

fore before this court will review an assignment of error based on the inadmissibility of evidence, where it clearly appears that the defense understood its right to object, except in those instances of manifest miscarriage of justice, there must be an appropriate objection or protest lodged before the trial court so that the court and opposing counsel will be put on notice that the admissibility is in dispute. Otherwise we will consider the objection waived. See paragraph 154 d, Manual for Courts-Martial 1951. It should be apparent that to hold otherwise would result in an inefficient appellate system, interminable delays in the final disposition of cases, and careless trial representation.

While we have suggested the proper method of preserving error for purposes of appeal we are not disposed to rest our decision on the absence of manifest injustice. We believe that for future guidance of the military courts it is desirable that principles governing the introduction of official military documents be announced. We therefore dispose of petitioner's contention that the extract copies of the morning reports were inadmissible because (1) they are hearsay evidence, and (2) irregularities in preparation take the reports outside the exception to the hearsay rule. We shall dispose of these in the order stated.

Official documents are considered an exception to the hearsay rule and the reason for this exception is stated in the case of Chesapeake & D. Canal Co. v. United States, 240 F. 903, 907 (C. A. 3d Cir):

"We understand the general rule to be that when a public officer is required, either by statute or by the nature of his duty, to keep records of transactions occurring in the course of his public service, the records thus made, either by the officer himself or under his supervision, are ordinarily admissible, although the entries have not been testified to by the person who actually made them, and although he has therefore not been of-

fered for cross-examination. As such records are usually made by persons having no motive to suppress or distort the truth or to manufacture evidence, and, moreover, are made in the discharge of a public duty, and almost always under the sanction of an official oath, they form a well-established exception to the rule excluding hearsay, and, while not conclusive are 'prima facie' evidence of relevant facts. The exception rests in part on the presumption that a public officer charged with a particular duty has performed it properly. As the records concern public affairs, and do not affect the private interest of the officer, they are not tainted by the suspicion of private advantage."

Morning reports are part of the Army's official system of personnel record keeping. They are, according to Army Regulation, a "daily statistical personnel and historical record of an organization of the Army." (SR 345–400–1, 12 October 1949, Section 1, Paragraph 1). Paragraph 2 of the same regulation has this to say with regard to their importance and use:

"The morning report, in various forms, has been in use since the days of the Revolutionary War. In keeping with modern methods of personnel accounting, the present-day morning report is the basic source of data required in the preparation of vital strength returns, personnel reports, statistical reports required by various planning agencies, etc. It is used as legal evidence in military courts-martial proceedings and is continually referred to for numerous other data pertinent to the organization and personnel for whom it is prepared. The morning report is one of the most important documents prepared on a daily basis throughout the Army. It has a significant historical value and is ultimately forwarded to The Adjutant General where it becomes a matter of permanent record."

These reports meet all tests required in an official record. The commanding officer of the unit has an official duty to perform and he is required to know or to ascertain through customary and trustworthy channels of information the truth of the facts or events recorded. The records thus made by him are competent prima facie evidence of the facts or events without calling him to the stand to testify. See Wigmore, Evidence, § 1631, et seq., and MCM, 1949, paragraph 130 (a) and (b). Furthermore, there is a presumption that the records emanating from official unit sources are the records required by regulation to be kept and that the person recording even though not shown as the commanding officer knew or had the duty to know or ascertain the truth of the facts or events recorded. Courts have long indulged in the legal presumption of regularity in the conduct of governmental affairs. United States v. Pugh, 99 U. S. 265, 271, 25 L ed 322, 324, — S Ct —; Johnson v. United States, 225 U. S. 405, 411, 56 L ed 1142, 1144, 32 S Ct 748. In the absence of a showing to the contrary, this court must presume that the Army and its officials carry out their administrative affairs in accordance with regulations and that morning reports reach the level of other official documents.

While the original morning reports were not introduced in evidence, this is not a requirement. Extract copies of the reports authenticated by the officer having custody thereof are properly admissible in evidence as duplicates of the original records which obviously must remain in official files. This has long been the rule in both military and civilian courts. The United States Supreme Court in the case of Stebbins v. Duncan et al., 108 U. S. 32, 27 L ed 641, 2 S Ct 9, announced the rule applicable in federal civilian courts. Mr. Justice Woods, speaking for that Court, stated (p. 50):

"For it is a settled rule of evidence that every document of a public nature which there would be an inconvenience in removing, and which the party has a right to inspect, may be proved by a duly authenticated copy. Saxton v. Nimms, 14 Mass. 320; Thayer v. Stearns, 1 Pick 109; Dun-

ning v. Roome, 6 Wend. 651; Dudley v. Grayson, 6 Monroe, 259; Bishop v. Cone, 3 N. H. 513; 1 Greenleaf on Evidence, Section 484."

The service rule is stated on page 258 of the Manual for Courts-Martial, 1951, in the following language:

"In the case of an official record required by law, regulation, or custom to be kept on file in a public office, a duly authenticated copy is admissible to the extent that the original would be, without first proving that the original has been lost or destroyed and without otherwise accounting for the original. The term 'public office' includes a military office, even though only military personnel, or certain military personnel, have access thereto. Only an exact copy of the official record is admissible under this exception to the best evidence rule although it may consist merely of an extract of those portions material to the case."

It is, next, contended by the petitioner that the records disclose they were not signed in accordance with pertinent Army Regulations and that this irregularity takes them outside the "official document" exception to the hearsay rule. Specifically, that they show on their face they were not signed by the commanding officer of the unit, but were signed by the personnel officer of the regiment. This contention is broken down into two separate assertions: First, if the report shows it was not signed by the commanding officer the delegation of authority to the signing officer must affirmatively appear in the record; second, authority to sign cannot be delegated to an officer not belonging to the unit.

Paragraph 73 of SR 345–400–1, Department of the Army, 12 October 1949, prescribes rules for the signing of the reports. Insofar as pertinent to these documents it reads as follows:

"73. By whom signed.

"(a) When officers are present. Morning reports will be signed by the commanding officer of the reporting unit or headquarters, or by an officer designated by the commanding officer.

"(b) When no officers are present. In the event that no officers are to be present with the reporting unit, morning reports will be authenticated by an officer designated by the commanding officer of the reporting unit. The designated officer may be an officer of a higher headquarters or of a neighboring unit. Where the officer designated to sign morning reports is not a member of a reporting unit or of a unit subordinate thereto, designation of such officer should be made with the prior approval or acquiescence of his or her commanding officer. . . .

"Note: The above arrangement will be in effect *only* when no officers are present with the reporting unit."

Paragraph 73 (a) of the quoted regulation specifically authorizes the commanding officer to designate someone in his stead. This narrows the question to whether there must be affirmative evidence in the record showing the delegation of authority to sign. As already stated, all the necessary prerequisites to the validity of official acts are presumed to exist in the absence of evidence to the contrary. There is no contrary evidence in the record and there is nothing unusual, irregular or suspicious about designating personnel officers to perform this particular type of work. No good reason is suggested as to why they should not be assigned this task. On the contrary the War Department, at the time these officers were authorized, must have concluded that they would be used for such purposes when it classified their 'duties. TM 12–406, War Department, February 1946, defines their duties as follows:

"Directs and supervises activities relating to unit personnel. Supervises preparation and maintenance of records, rosters, correspondence, and reports pertaining to personnel matters; maintains service records of military personnel and supervises clerical staff in proper handling of

forms; requisitions personnel according to qualifications, and handles matters pertaining to transfers and promotions; supervises preparation of pay rolls, vouchers, applications, and reports relative to pay, travel, allotments, and deductions; prepares plans and makes recommendations relating to personnel requirements. May be delegated responsibility for classification and assignment procedures."

We assume that a company commander would be generally aware of the nature of the duties performed by a personnel officer and in designating him as the officer to sign the reports the designator would be acting in accordance with good administrative practice. We must presume that the commanding officer adopted a preferred practice and designated the personnel officer; or, that the latter arrogated to himself the duties belonging to another officer. As between the two, we believe the former in keeping with and the latter contrary to ordinary standards of conduct. Such being the case, the presumption of regularity attends and if petitioner seeks to overcome the presumption he must introduce some evidence to rebut it.

The arguments to sustain the second assertion made by petitioner, to the effect that the designated officer must be a member of the reporting unit, are not well-founded. Paragraph 73 (a), previously quoted, does not on its face limit or restrict the commanding officer in his designation. In the absence of a clear showing that such a limitation was intended we must assume the natural and ordinary meaning of the words used. Moreover, it would be contrary to common sense for us to imply any such restriction. The necessities of the service during combat, and for the most part during garrison duty, require that, if reasonably possible, records be kept at some central office removed from disturbance, confusion or annoyance. Possibility of loss or destruction should be avoided. Accuracy is desired, and the many entries showing a soldier's status can be better assembled, collated and recorded where office facilities are available. Many of the entries are influenced by happenings outside the unit, and the flow of information to a central collecting agency is less impeded. The dictates of sound and orderly administration argue against construing the provision so that administrative officers cannot be designated to perform vital administrative duties.

Furthermore, we believe that to interpret the subsection in accordance with the arguments of petitioner would be contrary to lessons learned over many years. Unit commanders and unit officers have long been overburdened with combat and administrative details, and numerous changes have been made in our new procedure to lessen the administrative load. We consider it fair to assume that the Army has been and still is seeking to correct the deficiencies inherent in the system and that changes in regulations would only be made to improve its efficiency as a fighting force. To keep the administrative load on combat officers would not accomplish this result. Each successive amendment in the regulations seems to indicate the War Department was aware of the burden and sought to lessen it. Prior to January 3, 1945 the commanding officer of a unit (not including a headquarters) had not been authorized to delegate his duty to sign the reports. On that date the regulations were changed permitting such delegation without limitation. Had experience taught that limitation to unit officers was desirable it would have been a simple task to have so worded the regulation. Shortly after January 3, 1945 personnel officers commenced signing reports and the practice became widespread. In spite of this, when the regulations were revised in 1949 the War Department left the right of the commanding officer to delegate the authority unrestricted when it would again have been an easy task to expressly limit it. When experience dictated further extension of the right to designate, the Defense Department not only authorized commanding officers to designate someone else; it went further and authorized higher

headquarters to designate officers not belonging to the unit, including personnel officers. Regulations should not be interpreted to bring about impracticable and undesirable results, and in view of the history, development and reasons for the various amendments, we conclude that to interpret the subsection contrary to its express terms would do just that.

Paragraph 73(b) does not require a different construction. While that subsection specifically mentions the authority to designate an officer of a higher or neighboring unit it must be noticed that it is dealing only with the situation when there are no officers present. If the two paragraphs were dealing with similar situations then the mention of higher headquarters in the second might indicate an intent to exclude higher headquarters from the provisions of the first. But there are good reasons to apply the two to different conditions as the wording suggests. When there are officers present it is not required that some one other than the commanding officer sign the reports. The act, under those circumstances, is permissive. But, when no officer is present a designation is mandatory as enlisted personnel are not authorized to sign, and the designation must of necessity be outside of the reporting unit. Without some specific instructions the senior non-commissioned officer would be unguided as to what officers were authorized to perform the administrative duties of the commanding officer. Subsection (b) furnishes the guide. In addition when a commanding offcer is present, even though he delegates the authority to sign, he has the duty to make certain the records are being accurately maintained. When no officer is present this responsibility could only be fixed by regulation and it was necessary to enact subsection (b)

to accomplish that result. In one instance there is always a responsible head. In the other, a regulation was necessary to fasten the responsibility on a member of another unit.

This precise question was considered by an Army board of review in the case of United States v. Weatherford, 1 CMR 379, (September 18, 1951). The decision in that case treats the issue as historically developed and well states the reason why the two subsections should be reconciled together without limiting the first by any implications suggested in the second. We believe the reasons advanced in that case to be persuasive and adopt them as additional ground for overruling petitioner's contention.

Lastly petitioner asserts that because the reports were signed by the personnel officer who failed to indicate that he was signing "For and in the absence of the Commanding Officer" they are inadmissible. The paragraph reads as follows (SR 345–400–1, 12 Oct. 1949):

"74. Method of signing. The official signature in accordance with AR 340–20, will be typed or printed in the spaces provided for that purpose . . . If the morning report is signed in accordance with paragraph 73 (b), the words 'For and in the absence of the CO' will be typed or printed in parentheses in the signature box."

Suffice it to say in answer to this contention that the paragraph refers only to those instances when no officers are present and there is no showing of such a fact in this case.

The decision of the board of review is affirmed.

Chief Judge QUINN and Judge BROSMAN concur.