350

**UNITED STATES of America ex rel.
Frank PHELAN**

v.

**Joseph R. BRIERLEY, Warden.**

**Misc. No. 4108.**

United States District Court,
E. D. Pennsylvania.

March 31, 1970.

Abraham J. Brem Levy, John A. Papola, Philadelphia, Pa., for relator.

Richard A. Sprague, First Asst. Dist. Atty., Philadelphia, Pa., for respondent.

## OPINION

LUONGO, District Judge.

In this petition for writ of habeas corpus, Frank Phelan, a state prisoner, attacks his convictions for first degree murder and conspiracy to murder on Indictment Nos. 468–71, August Sessions, 1964, Court of Quarter Sessions, County of Philadelphia.

Briefly summarized, the facts are as follows:

On July 26, 1964, Phelan was arrested on charges of murder and conspiracy to murder in the shooting deaths of Judith Lopinson and Joseph Malito in Dante's Restaurant in Philadelphia, Pennsylvania. A day or so after his arrest Phelan gave a statement to the police setting forth the gruesome details of the crime and, on the same day, he testified under oath at a state habeas corpus proceeding instituted by Jack Lopinson,[1] Judith's husband, who had also been arrested and accused of plotting the murders with relator.

Phelan's statement and his testimony at the habeas corpus hearing were to the effect that Jack Lopinson had hired him, agreeing to pay him $10,000 to murder Malito and Judith; that he and Lopinson drove to Delaware to purchase the murder weapons; that on the night of the murders, Lopinson secreted Phelan in the basement of Dante's to await the victims; that Phelan shot both victims twice in the head and he then shot Jack Lopinson in the leg to make the murders look like the work of a burglar; that Phelan then proceeded to the Delaware River where he discarded the murder weapons.[2]

On October 26, 1964, Phelan appeared with privately retained counsel,[3] John Patrick Walsh, Esquire, for arraignment. A plea of guilty was entered to the conspiracy charges and to murder generally.[4] The state record reveals that during these proceedings Phelan admitted, *inter alia*, that he shot Judith Lopinson and Joseph Malito; that he had consulted with counsel concerning possible defenses and the charges pending against him and that he had then agreed to plead guilty; that his plea was voluntary; that he understood that he could still be found guilty of first degree murder and sentenced to death.

---

1. Joseph Malito and Jack Lopinson were partners in Dante's Restaurant.

2. Phelan later pointed out to the police the spot where he discarded the weapons. The police recovered the weapons there.

3. Phelan was not represented by counsel until August 12, 1964. By that time, Phelan had made two statements to the police and one in open court. Phelan would later testify as a Commonwealth witness in the Lopinson trial in January and February, 1965.

4. In Pennsylvania, an accused cannot plead guilty to first degree murder. Common-

monwealth v. Ahearn, 421 Pa. 311, 218 A.2d 561 (1966). Instead a plea of guilty to murder generally is entered. The plea will support a conviction for second degree murder. The Commonwealth then has the burden of proving first degree murder before a three-judge court designated to hear the case. See Commonwealth ex rel. Kerekes v. Maroney, 423 Pa. 337, 223 A.2d 699 (1966); Commonwealth ex rel. Crosby v. Rundle, 415 Pa. 81, 202 A.2d 299 (1964); Commonwealth v. Iacobino, 319 Pa. 65, 178 A. 823 (1935).

In July 1965, Phelan had a falling out with Walsh and requested that new counsel be appointed for him. Walsh was permitted to withdraw as counsel and, in August 1965, the state court appointed present counsel, Messrs. Levy and Papola, to represent Phelan. On October 11, 1965, the date scheduled for trial on the degree of guilt, and almost one year after entry of the plea, Phelan's new counsel presented a motion for leave to withdraw the guilty plea on the ground that Phelan was not competent to enter a valid plea when he was arraigned.[5] Counsel sought a continuance to enable them to make further inquiries to substantiate that claim. The continuance was refused and defense counsel were ordered to produce evidence bearing on the issue of Phelan's competence or incompetence at the time of arraignment. Defense counsel would not, or could not, do so and the trial court denied the motion to withdraw the plea and began hearing testimony to determine the degree of guilt.

During the course of trial, the defense attempted to introduce psychiatric evidence to the effect that at the time the crime was committed, Phelan was suffering from a mental disease which prevented him from conforming his conduct to the requirements of the law. Since Pennsylvania follows the so-called "M'Naghten" [6] tests to determine criminal responsibility, the court refused to admit the psychiatric evidence offered by the defense, ruling that it could and would be considered only in determining the sentence.

Defense counsel also moved to have Phelan examined by a psychiatrist to determine Phelan's competence to stand trial.[7] The court took the motion under advisement. At the conclusion of the trial, after having had an opportunity to observe Phelan during the proceedings, the court ruled that Phelan was competent to stand trial and denied counsel's motion for an examination.

The trial court ultimately found Phelan guilty of murder in the first degree. The court imposed the sentence of death on each count of murder and a sentence of one to two years imprisonment on the bills charging Phelan with conspiracy. On appeal, the Supreme Court of Pennsylvania affirmed the decision of the trial court on all particulars. Commonwealth v. Phelan, 427 Pa. 265, 234 A.2d 540 (1967).

The instant petition, which Phelan refused to sign, was filed on his behalf by counsel. From what I can glean from counsel's voluminous and at times rambling brief, it is contended that Phelan's rights were violated in that: (1) the record does not indicate that the indictment was read to him at the arraignment and the failure to read the indictment denied him due process of law; (2) the trial court's refusal to permit him to withdraw the guilty plea made when he was allegedly not competent to enter

5. Counsel presented a number of other motions prior to, and during the trial: (1) motion for leave to hire an investigator at the Commonwealth's expense pursuant to 19 P.S. § 784; (2) motion for leave to hire a psychiatrist at the Commonwealth's expense pursuant to 19 P.S. § 784; (3) motion to withdraw the plea of guilty on grounds of after-discovered evidence. This third and final motion was no more than a repeat of the motion to withdraw the plea on the grounds of incompetency.

6. The so-called M'Naghten test of criminal responsibility may be stated as follows: " * * * 'at the time of the committing of the act, the party accused was laboring under such a defect of rea-

son, from disease of the mind as not to know the nature and quality of the act he was doing, or, if he did know it, that he did not know he was doing what was wrong.' " United States v. Freeman, 357 F.2d 606, 608 (2d Cir. 1966), quoting from M'Naghten's Case, 10 Clark and Fin. 200, 210 (1843).

7. This motion was apparently made under the Pennsylvania Mental Health Act of 1951 which incorporated the common law on the subject. Basically, the granting or withholding of such an examination is within the sound discretion of the trial court. See Commonwealth v. Novak, 395 Pa. 199, 150 A.2d 102 (1959); Webber v. Commonwealth, 119 Pa. 223, 13 A. 427 (1888).

a valid plea, and the trial court's denial of a continuance to enable counsel to make further investigations into the subject matter denied him the effective assistance of counsel, a fair trial and due process; (3) he was not competent at the time of the trial on degree of guilt and the court's proceeding under the circumstances was a denial of due process; and (4) the trial court's refusal to admit psychiatric evidence other than that prescribed by the M'Naghten rules on the issue of his sanity at the time the crime was committed was a denial of due process.

On September 15 and 17, 1969, an evidentiary hearing was held in this court to determine whether Phelan was competent when he entered the plea of guilty and when he stood trial on the degree of guilt. See, e. g., Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed. 2d 815 (1966); Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960); Noble v. Sigler, 351 F.2d 673 (8th Cir. 1965), cert. denied, 385 U.S. 853, 87 S.Ct. 98, 17 L.Ed.2d 81 (1966); Gearhart v. United States, 106 U.S.App.D.C. 270, 272 F.2d 499 (1959).

### I. *Phelan's Competence.*

Since the question of Phelan's mental competence is involved in a number of the constitutional issues raised by the petition for writ of habeas corpus, I will consider that matter first.

Due process requires that a person be competent before he can stand trial on a criminal charge. United States ex rel. Robinson v. Pate, 345 F.2d 691 (7th Cir. 1965), aff'd, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966); Noble v. Sigler, *supra*; Commonwealth v. Scovern, 292 Pa. 26, 140 A. 611 (1928). Due process also requires that a plea of guilty be made voluntarily and with a full understanding of the consequences [United States ex rel. Ackerman v. Russell, 388 F.2d 21 (3d Cir. 1968)] because it is in legal effect a conviction [Kercheval v. United States, 274 U.S. 220, 47 S.Ct. 582, 71 L.Ed. 1009 (1927)] which "operates as a waiver of all the constitutional, statutory, and judicially created safeguards afforded a defendant in a trial * * *." United States ex rel. Crosby v. Brierley, 404 F.2d 790, 797 (3d Cir. 1968). See United States v. Ptomey, 366 F.2d 759 (3d Cir. 1966); United States ex rel. Maisenhelder v. Rundle, 349 F.2d 592 (3d Cir. 1965). Obviously, a person who is mentally incompetent cannot enter an intelligent plea. See Pate v. Robinson, *supra*; Commonwealth v. Harris, 431 Pa. 114, 243 A.2d 408 (1968).

The test of competence of an accused to participate in criminal proceedings is whether " 'he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding —and whether he has a rational as well as factual understanding of the proceedings against him.' " Dusky v. United States, *supra* 362 U.S. at 402, 80 S.Ct. at 789. See Berry v. United States, 286 F.Supp. 816 (E.D.Pa.1968), rev'd on other grounds, 412 F.2d 189 (3d Cir. 1969); Commonwealth v. Harris, *supra*.

At the hearing, counsel for Phelan presented the reports and the testimony of two psychiatrists, Doctors Leopold and Appel, as well as testimony of Mr. Papola, one of Phelan's attorneys. Phelan also took the stand and testified. This was against the wishes of his counsel and over their objection. The Commonwealth offered the report and the testimony of Dr. Baldwin Keyes, a psychiatrist, and the testimony of relator's prior counsel, John Patrick Walsh, and his associate, John Rogers Carroll.

Having heard and considered the evidence, and having observed Phelan during the course of the proceeding in this court, I am convinced beyond doubt that at all relevant times Phelan was competent to understand, on a rational and factual level, the nature of the proceedings against him, and to consult with counsel.

The psychiatrists retained on Phelan's behalf diagnosed his mental condition as "paranoid schizophrenia." They indicated that relator was impulse-rid-

den, delusional, hallucinatory, and without insight. Both experts stated that relator could understand reality on an intellectual level, but they believed that such intellectual understanding was meaningless in light of his emotional drives. Both expressed the opinion that Phelan was incompetent at the time of the arraignment in October 1964, but Dr. Appel stated that he could not give an opinion with reasonable medical certainty as to Phelan's condition as of the date of trial in October 1965.

Dr. Baldwin Keyes, who examined relator in August 1964, stated in his report that Phelan was in a pre-psychotic stage; and that although Phelan had a very low level of self-control, he had the mental capacity to fully understand the nature of the proceedings against him in 1964 and 1965 and to consult with counsel.

The most illuminating testimony on this issue was presented by Phelan himself and his former counsel, John Patrick Walsh.[8] Walsh testified that he interviewed Phelan a number of times before the arraignment proceedings took place. He had had Phelan examined psychiatrically and had available the psychiatric reports and concluded that Phelan was competent to enter a plea and to stand trial. Walsh based his opinion on his own observations of Phelan, Phelan's ability to communicate with him, and the statements which Phelan made to him. According to Walsh and his associate, John Rogers Carroll, Phelan never denied the killings. Phelan also told them

that if the district attorney wanted to convict Jack Lopinson, the district attorney would have to play ball with him (Phelan). He admitted to counsel that he had made up the stories about having hallucinations (which had led at least one psychiatrist to believe he was schizophrenic). Walsh testified that prior to arraignment, he consulted with Phelan in regard to the plea that would be entered. After his own investigation into the crime, Walsh saw no alternative but to attempt to save Phelan's life by pleading guilty. He explained to Phelan the charges pending against him, the problems with a jury trial,[9] the results and possible consequences of pleading guilty. After the matter was thoroughly reviewed and discussed, and after Walsh's recommendations were considered, Phelan decided to plead guilty.

■ John Patrick Walsh has been a member of the criminal bar in Philadelphia for over thirty years. He has handled over 200 homicide cases, many of them involving the death penalty. His opinion as to Phelan's competence, by reason of his experience and expertise in this area of the law, is entitled to great weight.[10] Berry v. United States, *supra.*

Phelan's statements to Walsh also indicate that Phelan knew what he was doing. Further, in the letter which Phelan sent to Walsh advising that he was going to dismiss him as counsel, Phelan evidenced more than a rudimentary grasp of the law and of his rights.

8. Initially Walsh's testimony was limited to his observations of Phelan during the time Walsh represented him, since Phelan himself indicated to the court that he did not waive the attorney-client privilege. After Walsh testified, however, Phelan took the stand and directly attacked Walsh's credibility and testified as to what he had told Walsh. Before Phelan testified, he was warned that he might be waiving his privilege vis-a-vis Walsh. After Phelan's testimony was completed, the Commonwealth recalled Walsh, who was then permitted to refer to and testify about his entire file in the matter, including statements made to him by Phelan.

9. Walsh stated that in his professional opinion, he could not have proven insanity under the M'Naghten test, and Phelan's confession appeared to be voluntary (particularly the statement he gave in open court) and, hence, could not be suppressed at trial.

10. Mr. Walsh's assistant, Mr. Carroll, disagreed with his superior on the question of Phelan's competency. After interviewing Phelan in prison, Carroll concluded that Phelan was "hopelessly insane."

Phelan's performance at this hearing was even more enlightening. He, of course, denied that he had ever told Walsh he was guilty. He stated that he was dumbfounded when Walsh blurted out at the arraignment that a guilty plea was to be entered. On cross-examination, Phelan parried and sparred with the Commonwealth's attorney concerning the answers he had given and the statements he had made during the arraignment. Phelan was able to remember those statements which apparently aided his cause, but could not remember those which might be harmful. In my view Phelan was not a truthful witness, but he did convince me, by the manner in which he responded to questions in the emotionally disturbing atmosphere of cross-examination, that he was not only competent, but shrewd and cunning as well.

A review of the state record likewise reveals that in the instances where Phelan was called upon to answer questions, he did so in an intelligent and responsive manner, and in other instances he interjected statements into the court proceedings which indicated an awareness and comprehension of what was taking place.

I find, therefore, that Phelan was fully competent to understand the nature of the proceedings against him and to consult with counsel both at the time of arraignment in October 1964, and at the trial in October 1965.

■ Since Phelan was competent at the time the plea was entered, and the state record indicates that the plea was otherwise voluntary [United States ex rel. McCloud v. Rundle, 402 F.2d 853 (3d Cir. 1968)], the plea of guilty was valid.

II. *Denial of the Effective Assistance of Counsel.*

Counsel has argued that the trial court's refusal to grant a continuance or permit Phelan to withdraw the plea of guilty on the ground of incompetence and the court's adverse rulings on other motions presented on Phelan's behalf violated his rights to effective assistance of counsel and a fair trial.

■ The right to withdraw a plea of guilty is not absolute under either Pennsylvania or federal law. United States v. Ptomey, *supra*; Commonwealth v. Scoleri, 415 Pa. 218, 202 A.2d 521, 203 A.2d 319 (1964); United States v. Stayton, 408 F.2d 559 (3d Cir. 1969). Rule 320, Pa.R.Crim.P. reads as follows:

"At any time before sentence, the court may, *in its discretion*, permit or direct a plea of guilty to be withdrawn and a plea of not guilty substituted." (Emphasis added)

Such a motion is directed to the sound discretion of the trial court, and will not be disturbed unless the decision is arbitrary or capricious. United States v. Ptomey, *supra*; Hansen v. Mathews, 296 F.Supp. 1328 (E.D.Wis.1969); Commonwealth v. Scoleri, *supra*; United States v. Hughes, 325 F.2d 789 (2d Cir.), cert. denied, 377 U.S. 907, 84 S.Ct. 1167, 12 L.Ed.2d 178, reh. denied, 377 U.S. 940, 84 S.Ct. 1332, 12 L.Ed.2d 304 (1964); United States ex rel. Jackson v. Banmiller, 187 F.Supp. 513 (E.D.Pa.1960).

■ Counsel has contended that Phelan should have been permitted to withdraw the plea because he was incompetent at the time the plea was entered, but no evidence was presented to the state court on this issue,[11] hence I cannot now say that the state court's refusal to permit withdrawal of the plea was such an abuse of discretion as to deny Phelan's rights to the effective assistance of counsel or a fair trial. See United States ex rel. Grays v. Rundle, 293 F.Supp. 643 (E.D.Pa.1968); United States ex rel. Rivera v. Follette, 395 F.2d 450 (2d Cir. 1968); Papalia v. United States, 333 F.2d 620 (2d Cir.), cert. denied, 379 U.S. 838, 85 S.Ct. 74, 13 L.Ed.2d 45 (1964). Moreover, had the evidence which was presented at this

11. At the time of trial relator's counsel admittedly had at their disposal all the evidence they presented at this hearing, but they chose not to present it.

hearing been presented to the state trial court, it would not have established, as I have heretofore indicated, that Phelan was incompetent at the time he entered the plea. The failure of the state court to grant the continuance or to permit the withdrawal of the plea, therefore, could not have been prejudicial. See Ungar v. Sarafite, 376 U.S. 575, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964); United States ex rel. Rivera v. Follette, *supra.*

The other rulings of which relator complains here (i. e., refusal to grant funds to hire an investigator and a psychiatrist) were adequately disposed of by the state court. For the reasons set forth in the opinion of the Pennsylvania Supreme Court on appeal from the convictions, Commonwealth v. Phelan, 427 Pa. 265, 234 A.2d 540 (1967), I agree that Phelan's rights were not violated by the trial court's rulings on these matters.

### III. *Arraignment.*

It is contended that the transcript of the arraignment proceedings indicates that Phelan was not validly arraigned. The record of the arraignment contains the notation: "Defendant, arraigned at bar of the court, pleads guilty to Bill No. 468, Murder, and to Bill No. 469, Murder." It is argued that the lack of a verbatim transcript establishes that the indictment was not read to Phelan, and that he did not plead guilty.

 The Supreme Court of Pennsylvania has ruled that this notation on the record clearly evidences that a proper arraignment was held. Commonwealth v. Phelan, *supra.* That ruling is binding on me insofar as it interprets the procedure the notation purports to reflect. *Cf.* United States ex rel. Speaks v. Brierley, 417 F.2d 597 (3d Cir. 1969). Further, were I not bound by the state court's interpretation, I would still conclude that the arraignment

was valid. The purpose of an arraignment is to inform the accused of the nature of the charges against him, and give him an opportunity to plead thereto. Yodock v. United States, 97 F.Supp. 307 (M.D.Pa.1951). As the Supreme Court of Pennsylvania stated: "[One] would have to completely distort his thinking to believe that Phelan was not fully aware of the nature of the charges lodged against him, or that he was denied ample opportunity of expressing his plea thereto." Commonwealth v. Phelan, *supra,* 427 Pa. at 273, 234 A.2d at 545. Furthermore, in Johnson v. United States, 225 U.S. 405, 411, 32 S.Ct. 748, 750, 56 L.Ed. 1142 (1912), the Supreme Court, in interpreting a federal court record, stated that the word "arraignment" is "comprehensively descriptive" of the performance "of that which the law prescribes by it." In other words, it describes the reading of the indictment and the entering of a plea thereto.

There is no merit to the claim that Phelan's constitutional rights were violated by an invalid arraignment.

### IV. *The M'Naghten Rules.*

 The main thrust of counsel's argument here and in the state courts has been that the Commonwealth's reliance upon the M'Naghten rules as the sole test for determining criminal responsibility violates due process. In effect, Phelan's counsel seek to have me declare that aspect of Pennsylvania law unconstitutional and substitute or add what counsel consider a more modern rule of criminal responsibility.[12]

The Supreme Court of the United States has consistently refused to impose upon the States a federal standard to determine criminal responsibility, or to require the States to add newer tests to the M'Naghten rules. As late as 1952,

---

12. The brief submitted by relator's counsel suggests combining M'Naghten with one of the many tests set forth in the Circuit Courts of Appeal in Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862 (1954); United States v. Cur-

rens, 290 F.2d 751 (3d Cir. 1961); United States v. Freeman, 357 F.2d 606 (2d Cir. 1966); Wion v. United States, 325 F.2d 420 (10th Cir. 1963), cert. denied, 377 U.S. 946, 84 S.Ct. 1354, 12 L.Ed.2d 309 (1964).

in Leland v. Oregon, 343 U.S. 790, 800–801, 72 S.Ct. 1002, 1008, 96 L.Ed. 1302 (1952), the Court stated:

"Knowledge of right and wrong is the exclusive test of criminal responsibility in a majority of American jurisdictions. The science of psychiatry has made tremendous strides since that test was laid down in *M'Naghten's Case,* but the progress of science has not reached a point where its learning would compel us to require the states to eliminate the right and wrong test from their criminal law. Moreover, choice of a test of legal sanity involves not only scientific knowledge but questions of basic policy as to the extent to which that knowledge should determine criminal responsibility." [13]

Today, as in 1952, the majority of jurisdictions still retain the M'Naghten rules as the sole test for determining criminal responsibility. See United States v. Currens, 290 F.2d 751 (3d Cir. 1961); Levermore and Meehl, The Virtues of M'Naghten, 51 Minn.L.Rev. 789 (1967); Diamond, From M'Naghten to Currens and Beyond, 50 Cal.L.Rev. 189 (1962). The present state of scientific knowledge does not dictate that a new rule must be added to or substituted for M'Naghten. As Judge Biggs has suggested in *Currens,* the States and the federal circuits should be used as laboratories for the development of substantive law in this area so that the conflicting social, political and scientific policies can be satisfied. The wisdom of this approach can be perceived in the criticism which followed the adoption of a new rule of criminal responsibility by the District of Columbia Circuit in Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862 (1954). See United States v. Freeman, 357 F.2d 606 (2d

Cir. 1966); McDonald v. United States, 114 U.S.App.D.C. 120, 312 F.2d 847 (1962); Blocker v. United States, 110 U.S.App.D.C. 41, 288 F.2d 853 (1962), cert. denied, 375 U.S. 923, 84 S.Ct. 269, 11 L.Ed.2d 167 (1963); Weihofen, The Flowering of New Hampshire, 22 U.Chi. L.Rev. 356 (1955). The Supreme Court of Pennsylvania has also had difficulty in determining the proper test, even though it has consistently upheld the M'Naghten rules as the sole criteria. See the dissenting opinions of Justices Roberts and Cohen in Commonwealth v. Ahearn, 421 Pa. 311, 218 A.2d 561 (1966).

Due process does not require that Pennsylvania abandon the M'Naghten rules in favor of any particular federal standard of criminal responsibility.

### V. *Relator's Competence to Participate in These Habeas Corpus Proceedings.*

Since his counsel had raised the question of Phelan's mental competence, the Commonwealth's attorney, at the outset of the hearing in this court, requested that Phelan be examined by a psychiatrist to determine whether he was competent to participate in these habeas corpus proceedings. Later, convinced that there was no basis for a claim of incompetence, the Commonwealth withdrew its request, but Phelan's counsel proceeded with arrangements for such an examination. On September 29, 1969, Dr. Robert L. Sadoff made the examination and his report was made part of this record by agreement.

Dr. Sadoff's report concluded that Phelan was not competent to participate in these proceedings or to consult with counsel because Phelan believed that his attorney, Mr. Levy, was conspiring against him. My reading of the report

---

13. Justice Frankfurter reiterated the same thought in his dissenting opinion in Leland at 803, 72 S.Ct. at 1010:

"At this stage of scientific knowledge it would be indefensible to impose upon the States, through the due process of law which they must accord before de-

priving a person of life or liberty, one test rather than another for determining criminal culpability, and thereby to displace a State's own choice of such a test, no matter how backward it may be in the light of the best scientific canons."

indicates that Phelan simply disagreed with Levy's efforts to attempt to prove that Phelan was and is insane and incompetent. Phelan has consistently demonstrated a lack of respect and perhaps even a dislike for counsel (present as well as past), but this does not establish a lack of ability to understand the proceedings and to consult with his counsel, if he desires to do so, with a "reasonable degree of rational understanding."

I find that Frank Phelan was, at the time of the hearing in this court, competent to participate in these proceedings seeking a writ of habeas corpus.

The petition for writ of habeas corpus will be denied.