UNITED STATES of America ex rel.
Anthony SCOLERI

v.

William J. BANMILLER, Warden, Eastern State Penitentiary, Philadelphia, Pennsylvania.

Misc. No. 2222.

United States District Court
E. D. Pennsylvania.

Oct. 4, 1961.

Michael von Moschzisker, Philadelphia, Pa., for relator.

James C. Crumlish, Jr., Dist. Atty., Philadelphia, Pa., for defendant.

GRIM, District Judge.

Relator, confined in a Pennsylvania prison under sentence of death for first-degree murder, has petitioned for a writ of habeas corpus. He appealed his conviction to the Supreme Court of Pennsylvania, which affirmed the judgment, Commonwealth v. Scoleri, 1960, 399 Pa. 110, 160 A.2d 215. The Supreme Court of the United States denied certiorari, 1960, 364 U.S. 849, 81 S.Ct. 93, 5 L.Ed. 2d 72. Respondent has filed an answer to the petition for habeas corpus, and extensive testimony has been taken.

The murder trial began at Philadelphia Monday, November 17, 1958, and lasted nine days. Relator's defense was an alibi. On the sixth day, Saturday, relator's brother testified for the defense. Later that day relator testified in his own defense. The brother's testimony conflicted with relator's in such a way as to weaken relator's defense considerably and made it appear that relator would be convicted.

On the morning of the seventh day of the trial, Monday, November 24, a guard at Holmesburg Prison, Philadelphia, found relator, "lying on cell Bed, with left arm cut in a few places, cell in some disorder & Blood spattered on floor & walls." The guard summoned a prison doctor at about 6:35 a. m. The doctor arrived on the scene at about 7:00 a. m., and examined relator both in his cell and in the hospital block of the prison, to which he was carried on a stretcher.

On examination, the doctor found 24 shallow cuts, between the wrist and the elbow, in relator's left arm. Only one cut, near the elbow, went through the skin, and when the doctor examined him, blood was flowing very slowly (the doctor called it "welling") from only this cut. At the time of the examination relator was conscious, his pulse rate was 74, his blood pressure was normal (the reading being 130/82), his color was good, his breathing was good, and his general physical condition, save for the cuts, was good. He appeared strong enough to run. His eyes were squeezed tight shut, his head was rolling back and forth, and he did not speak. While the doctor was treating him, cleaning, sterilizing, and suturing the cuts, relator tried to fight the insertion of the sutures. He did not respond when the doctor asked that he twist his hands or move his fingers, a test of possible damage to the tendons.

At the *doctor's direction* relator was given 600,000 units (an average dose) of penicillin to prevent infection from the cuts, and 100 milligrams of thorazine (chlorpromazine), a tranquilizer, to quiet him.

Directly after this treatment relator was placed in a wheel chair and taken to the prison yard, where he was carried and placed on a stretcher in a prison van for transportation to the trial. In the van he appeared to be listless, motionless, lifeless, and in a stupor. On arrival at the place of trial, City Hall in Philadelphia, relator was carried out of the van on a stretcher to an elevator, where the guards placed him on a chair to get him on the elevator. On leaving the elevator he was again placed on a stretcher and carried on it to an anteroom to the court room.

In the anteroom he was examined by Dr. Bove, a physician in the Police Surgeon's office, at about 9:30 a. m. At that time relator was sitting in a chair. He appeared somewhat somnolent and his pupils were contracted, but he revived easily when the doctor applied aromatic spirits of ammonia to his nostrils, although he resisted this attempt to revive him. His pulse was full and regular, about 78. The doctor took out a pack of cigarettes and said, "Tony, have a cigarette." Relator reached over, took a cigarette from the pack, and put it in his mouth. He retained his position in the chair. During the examination relator answered when the doctor spoke to him. In the doctor's opinion relator was then alert enough to know what was going on, 95% of full alertness, and was competent to stand trial.

As Dr. Bove was leaving at about 10:00 a. m., another police surgeon, Dr. Carideo, entered and examined relator. When Dr. Carideo made his examination,

relator was lying on a stretcher, his eyes were closed. He said nothing, his blood pressure was slightly low, his pulse was rapid, there was no pallor, and there was no sign of respiratory depression. His muscle tone was good. When the doctor held a phial of aromatic spirits of ammonia to his nose he quickly and forcefully turned his head from side to side, and when the doctor persisted, relator took a deep breath and held it until the doctor removed the ammonia. There was an element of resistiveness when the doctor manipulated his arms. He did not respond to the doctor's questions. The doctor felt that he was under the influence of some sedation, and for this reason recommended to the trial judge that he should not be put on trial, but should be allowed a sufficient time in which whatever he might have been given would dissipate. He examined relator several times during the day and at 7:30 p. m. he observed that relator's pupils were no longer contracted, that his pulse rate was better, that his blood pressure was normal for his age and body build, and that his respiration was still not embarrassed. On the basis of the doctor's opinion that relator was then fit to stand trial, the trial resumed at 7:30 p. m.

When the trial resumed, relator lay motionless on a stretcher. Dr. Carideo remained continuously in attendance on him that evening, and there was no change in his condition. At one point during the evening relator said he was cold and pulled a blanket up close to his neck. He also asked for water.

At 10:20 p. m. on the seventh day of the trial, after the defense had completed its evidence and before the prosecution presented its rebuttal evidence, defense counsel objected to the production of any rebuttal on the ground that relator's condition at that time was such that defense counsel were unable to consult with him or talk to him about the evidence about to be offered. The response of the court was:

"I have been advised before we brought him in that he was able to consult. I have been advised by the doctors. A doctor is here in attend-

ance, and he has stated that since that time he is better able than he was five hours ago, which antedated the time we started this session by two hours, and you notice this, he has asked for water, and he has asked for a blanket, and inasmuch as some of the testimony has been taken within his presence and within his hearing, I do not propose to have this case interrupted any longer.

"Your objection is overruled."

The trial proceeded.

When the trial recessed that night relator was returned to the prison at about 11:45 p. m. He walked into the van at City Hall that night. When he arrived at the prison he walked out of the van and up five or six steps into the prison hospital.

Relator now seeks habeas corpus, contending that his conviction was void (1) because evidence of his criminal record was placed before the jury, (2) because relator was not present when the trial judge heard evidence of his ability to stand trial, and (3) because during part of the trial he was unable, because of his physical condition as previously described, to receive the effective assistance of counsel.

### Criminal Record

The Court of Appeals for the Third Circuit held in United States ex rel. Thompson v. Price, 1958, 258 F.2d 918, 923, that the Pennsylvania procedure of admitting evidence of the defendant's criminal record, prior to any verdict, in order to guide the jury in fixing the punishment in the event of a verdict of guilty of first-degree murder, "does not pass the bounds laid down for state procedure by the due process clause," 258 F.2d at page 922. While the Court of Appeals was divided on this case, the decision stands and is binding on this district court. It would not become this court to accept counsel's invitation to speculate on the possible effect of changes in the membership of the Court of Appeals.

The Pennsylvania statute allowing the jury to determine the penalty in cases of

murder in the first degree was amended following Scoleri's conviction but before final argument on his appeal to the Pennsylvania Supreme Court, by the Act of December 1, 1959, P.L. 1621, 18 P.S. § 4701. The amendment provides for a "split verdict" in such cases. The jury is first to determine the defendant's guilt or innocence, and then, in the event of a verdict of guilty of murder in the first degree, the jury is to "receive such additional evidence not previously received in the trial as may be relevant and admissible upon the question of the penalty to be imposed upon the defendant * * *. The jury shall then retire and consider the penalty to be imposed and render such verdict respecting it as they shall agree upon." In relator's appeal the Pennsylvania Supreme Court held that the amendment was not retroactive and not applicable to his case. The amendment in no wise affects the binding authority of United States ex rel. Thompson v. Price, supra, in which the court albeit with some reluctance, held the prior procedure not violative of due process.

### Absence When Trial Judge Heard Evidence of Ability To Stand Trial.

The trial judge heard the medical reports concerning relator's condition in the presence of counsel for the prosecution and the defense. The jury was not present, nor was the relator.

At the opening of court on the morning the trial judge charged the jury, the following occurred:

"The Court: Does the defense want a physical examination of the defendant this morning?

"Mr. McClain: No, sir.

"The Court: I have now dismissed the Commonwealth's physician.

"Before we start, I want you to know that under professional medical advice this defendant's trial continued, notwithstanding what you have witnessed here in this courtroom. The professional medical advice was that he was competent to hear everything intelligently, his pulse was normal, there was no high blood pressure, no distress, and there was no medical reason for this particular condition, an obvious condition, and the physicians say there was nothing wrong with him whatsoever. Had it been that he was incapable of hearing what was going on here, we could not have proceeded. We would have just had to continue the case. We continued it for one day, as you know."

Immediately thereafter the court charged the jury.

■ There are numerous general statements to the effect that a defendant is entitled to be present at every stage of criminal proceedings against him. The problem underwent close scrutiny in United States v. Johnson, 3 Cir., 1942, 129 F.2d 954, 144 A.L.R. 182,[1] affirmed on other grounds, Johnson v. United States, 1943, 318 U.S. 189, 63 S.Ct. 549, 87 L.Ed. 704. In that case, a prosecution for violation of the Internal Revenue Laws, the trial court excluded the defendant from the courtroom during argument on the admissibility of evidence. The Court of Appeals held that this did not deny the defendant his right to due process.

"The question which we have before us in the instant case is one which is extremely difficult to answer. Obviously it is not necessary for a defendant to be present at every stage of the proceedings against him. Due process does not require him to be in court when a true bill is returned against him by a grand jury or when his appeal is argued in the appellate court [citations].

---

[1]. While the Johnson case involved due process in the federal courts, rather than in the state courts as in the case at bar, the issue was due process of law, and as was said in the Johnson case, " * * * the phrase 'due process of law' used in the Fourteenth Amendment to restrain action by the states means substantially the same as that phrase of the Fifth Amendment, restraining action by the federal government."

The defendant must be in court when jurors are challenged [citations]. Certainly the defendant must be present when the jury is in the box and the trial is in progress. The defendant must be deemed to have the absolute right to hear everything which the jury hears if he is to protect himself. Under such circumstances his presence bears a relation 'reasonably substantial, to his opportunity to defend'. To exclude him from the court room upon such occasions would be to hazard his constitutional rights upon the theory an appellate tribunal might save him from jeopardy. He must be present when the jury is present and is receiving evidence. If he is, then the trial meets the substance of the stringent test laid down by Mr. Justice Roberts in his dissenting opinion in the Snyder case [Snyder v. Massachusetts], 291 U.S. [97] at page 129 [54 S.Ct. 330, 78 L.Ed. 674] * * *. Mr. Justice Roberts stated that the prisoner's constitutional right of presence ' * * * comprehend[s] the inquiry by the ordained trier of fact from beginning to end' * * *. In the instant case it appears that the defendant was present at all times that the jury was present and his absolute constitutional right of presence was not infringed." 129 F.2d 958, 959.

■ The only issue at the trial was whether, as a consequence of certain happenings some months previously, relator was guilty of murder, and if so in what degree. Whether or not defendant was physically and mentally competent during part of the trial was, of course, a vital matter, but it was not an issue for the determination of the jury, any more than would have been the possible incompetence of court or counsel at the trial. The court's comment immediately preceding the charge (quoted above) might well have been omitted, but the comment did not violate any of defendant's rights to due process.

■ Since the issue of relator's competence was not an issue for the jury, it did not constitute part of the trial, and it was not violative of due process for the court to hear the doctor's reports in relator's absence.

One important factor in addition is that defendant's counsel made no objection although they were present when the trial judge received the medical reports and had every opportunity to object to their receipt in the absence of defendant.

### Inability to Receive Effective Assistance of Counsel

Relator presented the testimony of himself, some of his relatives, a friend, and a fellow prisoner, which, if believed, would establish that during the trial he received surreptitiously and used a quantity of drugs, that he secreted them in his rectum and so was able to bring them into the prison undetected, that being in despair following the testimony of himself and his brother he attempted to commit suicide late Sunday night or early Monday morning by cutting his wrists and simultaneously taking the balance of the large quantity of drugs, that these drugs included seconal, nembutal, placidyl, and possibly butisol sodium, that the suicide attempt failed although he intended that it succeed, and that the effect of the drugs he took in the attempt, coupled with the thorazine given him later, had the effect of dulling his senses or awareness of his surroundings so that there could not be reasonable communication between him and his counsel, with the end result that during the seventh and perhaps the eighth day of the trial he was unable to cooperate fully with, or to receive the effective assistance of, his counsel.

■ It is incredible that he could take this quantity of powerful drugs and live. I accept as credible the testimony of Dr. Keyes that the taking of all these drugs would probably have caused death, or at the least a profound coma for a protracted period. I do not believe that relator, his relatives, his friend, and his fellow prisoner told the truth about the drugs.

I am impressed by relator's failure to produce his defense counsel to testify in this proceeding on the vital issue of his ability to communicate with them. I find that relator's apparent unconsciousness or inability to communicate at his trial was not real but was an intentional and deliberate effort on his part to convey a false impression. I find that he was conscious and able to communicate with his counsel during his entire trial.

The facts and law set forth in this proceeding constitute the court's findings of fact and conclusions of law.

### Order

And Now, October 4, 1961, the petition for writ of habeas corpus is denied.