Commonwealth, Appellant, *v.* Scoleri.
Commonwealth *v.* Scoleri, Appellant.

Argued April 24, 1964. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Arlen Specter,* Assistant District Attorney, with him *Burton Satzberg, Richard A. Sprague* and *Thomas M. Reed,* Assistant District Attorneys, *F. Emmett Fitzpatrick, Jr.,* First Assistant District Attorney, and *James C. Crumlish, Jr.,* District Attorney, for Commonwealth.

*Thomas D. McBride,* with him *Alan J. Davis,* and *Wolf, Block, Schorr and Solis-Cohen,* for defendant.

OPINION BY MR. CHIEF JUSTICE BELL, July 1, 1964:

These appeals arising from the second trial of Anthony Scoleri for murder,* reveal a record (a) that is so unusual and (b) professional conduct which is so indefensible as to jeopardize the public's respect

---

* The murder was committed on August 28, 1958.

for the Law and confidence in their trial Courts. Although there is no contention that Scoleri is innocent, and although the testimony in this case went far, far afield into irrelevant matters, the basic and ultimate question for this Court's decision is *whether Scoleri should be permitted to withdraw his guilty plea.*

This case, for reasons which will hereinafter clearly appear, requires lengthy analysis and discussion of the 559 page record, as well as of the important legal points involved.

The Commonwealth proved that Scoleri and a companion named Woods held up at gun point, Max Gordon, his wife, his daughter and her friend, Dinerman, in Gordon's home and store. Gordon was hit on the head by Scoleri with a gun and knocked to the floor. Although bleeding and in terrible agony, he was forced to get up and go behind the counter to turn over to Scoleri his money and other valuables. While behind the counter Gordon grabbed his pistol from a drawer and shot Woods.* During the gunfire Scoleri *shot Gordon three times,* twice in the chest and once in the stomach. Gordon died shortly thereafter from one of these gunshot wounds. The holdup and robbery, which were planned** by Scoleri, who produced a gun for himself and one for his brother, were brutal. Three persons,*** including two eye-witnesses to the shooting, identified Scoleri. Furthermore, the Commonwealth produced a great deal of corroborating evidence, plus a statement by Scoleri

---

* Who died about an hour later, and several days thereafter was buried by Scoleri in a woods in New Jersey.

** Richard Febo, who had been convicted of armed robbery and was asked by Scoleri to go back in business with him, testified that "Scoleri said he was going to pull a heist, and Febo said, 'If it is absolutely necessary, if you must use a gun the most you should do is shoot in the leg.'" Scoleri replied, "If I have to shoot, I will shoot him right here [indicating the stomach]."

*** At the first trial, four persons identified Scoleri.

to his landlady-friend that he shot Gordon. Scoleri, although invited by the Court before it announced that it had fixed the penalty at death, refused to take the witness stand or make any statement in his own behalf.

Scoleri's conviction at his first trial of murder in the first degree with penalty of death, was set aside by the United States Court of Appeals for the Third Circuit for reasons which will be hereinafter fully discussed.

When Scoleri was retried, i.e., in the present case before Judge SPORKIN, the drawing and selection of a jury became a long drawn out process covering four or five days. During the course of selecting the jury, Mr. von Moschzisker, counsel for Scoleri, asked several times for the withdrawal of a juror and a continuance because of newspaper publicity allegedly unfavorable to his client. Each request or motion was refused. He never asked for a change of venue. Thereafter, at side bar, von Moschzisker asked Judge SPORKIN whether he would give Scoleri a life sentence if Scoleri pleaded guilty. *Judge SPORKIN said he would make no promises.*

During recesses, von Moschzisker went to see Judge GOLD,* Judge ULLMAN,* Judge HAGAN** and Judge CARROLL, with each of whom he discussed his feelings about death sentences, intending *if he had confidence in his feeling against the death penalty* to ask him whether, in the event of a guilty plea, he would sit in the Scoleri case. Von Moschzisker testified that Judge CARROLL and Judge GOLD (and as above noted,

---

* We cannot understand why these Judges, whose testimony was utterly irrelevant and unnecessary, were called as witnesses by defense counsel.

**Judge HAGAN's views about the death penalty apparently were not satisfactory to von Moschzisker since he was not asked what penalty he would or would not give if he sat.

Judge SPORKIN) refused to make any commitment as to the sentence he would impose; Judge ULLMAN testified that he was asked for no commitment and gave none.

Judge SPORKIN then announced that the two Judges who would sit with him in the event of a guilty plea *would be chosen by the Court* from a list of six or seven whom he named, and that *von Moschzisker could not select the two Judges who would sit.* It is important for the administration of *Justice* for all lawyers to remember that it is *solely* the function and province of the Administrative Judge or the trial Judge or the appropriate Court, and not that of defense counsel, *to select* a Judge or a 3-Judge Court to hear guilty pleas and, after hearing all the evidence, determine the question of guilt and the penalty and sentence.

Judge SPORKIN then selected Judge KELLEY and Judge REIMEL to sit with him—if there was a guilty plea—to determine Scoleri's guilt, and the penalty and sentence which should be imposed. After von Moschzisker learned which Judges would sit in the event of a guilty plea, Scoleri, upon the advice of von Moschzisker, changed his plea to guilty.

What follows is so important and so shocking that we shall quote the relevant portions thereof:

(At 4:58 p.m. the defendant was brought into the Courtroom.)

"MR. SPRAGUE: At this time I am advised that the defendant, Anthony Scoleri, desires to enter a plea? May he stand up at the bar of the Court? I desire to ask him some questions before we proceed.

"Mr. Scoleri, you are represented by counsel, Mr. von Moschzisker? THE DEFENDANT: Yes, sir. MR. SPRAGUE: Have you discussed the entry of a plea with your counsel? THE DEFENDANT: Yes. MR. SPRAGUE: *You understand that no promises of any sort have been made concerning the entry of a plea by*

*you?** You understand that in the event you are found guilty by a Court composed of three judges of first degree murder you can get death in the electric chair?** THE DEFENDANT: Yes, I do.*** MR. SPRAGUE: You fully discussed it with your attorney?* THE DEFENDANT: I have.*** MR. SPRAGUE: You are ready to proceed? THE DEFENDANT: I am.* MR. SPRAGUE: May the defendant be arraigned?

"THE COURT [Judge SPORKIN]: Do you understand the significance of the entry of a plea of guilty by you? THE DEFENDANT: Yes, I do. THE COURT: Has what MR. SPRAGUE explained to you enabled you now to conclude that you are really desirous of entering a plea of guilty at this time? THE DEFENDANT: Yes, your Honor. THE COURT: You understand—I will repeat—that in the event that the two judges whom I will now call upon to sit with me to hear testimony and we come to the conclusion that the evidence warrants our finding a verdict of first degree murder that it then will become necessary for us to hear testimony with respect to your environment, your past life, and everything else which will be offered in connection with penalty *to enable the Court to determine what penalty should be imposed and the penalty may result in our determining that you undergo death in the electric chair.* Do you understand that? THE DEFENDANT: Yes, your Honor. THE COURT: Or it may be we will determine that life imprisonment will be the proper penalty. Do you understand? THE DEFENDANT: Yes."

Defendant then pled guilty to murder.

"BY JUDGE REIMEL: (Addressing the defendant, Anthony Scoleri.) "Q. Anthony Scoleri, Judge KELLEY and I were called here this morning to sit with

---

* Italics throughout, ours.

** Defense counsel subsequently termed these questions and the answers by Scoleri to be merely perfunctory and meaningless.

Judge Sporkin in this matter because we understand that you changed your plea yesterday and entered a plea of guilty; is that right? A. That is right. Q. *You understand the nature of the charge that faces you?* A. *I do.* Q. Although guided by your counsel, this is *of your own volition* that you have entered this plea? A. *Yes, sir.* By Judge Kelley: Q. *You understand what all this means?* A. *Yes, I do.*

The three-Judge Court, after carefully hearing and reviewing the evidence and the vigorous arguments and sympathetic pleas of counsel for Scoleri, and having taken into consideration the crime and the man (Scoleri) who committed it, *unanimously agreed to impose a sentence of death.* The record then shows the following: "Mr. Sprague: May the defendant first be asked, sir, if he has anything to say before the Court fixes penalty? Mr. von Moschzisker: *He has been asked that repeatedly.* Judge Sporkin: *Have you anything to say, Mr. Scoleri, before we fix the penalty?* The Defendant: *No, your Honor.* Judge Sporkin: . . . Proceeding to the fixing of the penalty, we have *unanimously* concluded that the murder of Max Gordon on August 28, 1958, in the course of an armed robbery, *demands the death penalty.* The Court, therefore, having adjudged the defendant, Anthony Scoleri, guilty of murder in the first degree, *fixes the penalty as death.* Mr. Scoleri, is there any reason why the sentence of death should not now be imposed upon you?"

Mr. von Moschzisker—who had stood beside Scoleri when he falsely said no promises of any sort had been made concerning the entry of a guilty plea—then said: "I have an unpleasant duty to perform. For the reason that I had *a flat promise from Judge* Reimel that he would impose life and for the reason that I had an additional indication that if the Court was not unanimous life would be imposed, I must move

to withdraw the plea of guilty. MR. SPRAGUE: Sir, I oppose any withdrawal. JUDGE REIMEL: Mr. von Moschzisker, of course *I think your statement is incorrect.* However, we will entertain what Mr. Sprague has to say. MR. SPRAGUE: May I say, sir, I oppose any withdrawal of the plea. Any discussions that I had with counsel and any discussions that I had with Judge SPORKIN prior to the entry of this plea of guilty, there was never an indication that there was any commitment made of any sort and at the time when this defendant changed his plea and entered a plea of guilty the defendant was asked whether there was any commitment or whether there was any understanding of any sort. From the Commonwealth's standpoint there is no commitment. We stated what we were seeking from the beginning and we oppose any withdrawal of any plea at this time."

"THE DEFENDANT: Your Honor, it was most reluctantly that I agreed to change my plea. *It was only on the assurance that there had been some prior agreement,* and I certainly would not have changed my plea if I did not have this assurance. [This was diametrically opposite to his prior statement that no promises of any kind had been made concerning the entry of a plea of guilty. Obviously Scoleri lied in one of these two statements.] MR. SPRAGUE: Now may I say in answer to that,.this Court, *Judge* SPORKIN *first individually and then the Court en banc* I asked the defendant prior to taking any testimony in this case whether he understood the significance of his plea, whether it was voluntarily, whether there was any understanding, and I say what you have before you *is now another desperate attempt to escape his just punishment.* I would ask this Court to decide that matter now."

"JUDGE REIMEL: I think I should make a statement here, because I think Mr. von Moschzisker's re-

marks are not only most unusual but not becoming a member of our Bar. You know for many years, not only with Michael von Moschzisker but others, since I have taught in law school, I have discussed with attorneys different problems, and the Scoleri case was just a name to me when he and I discussed the facts which he gave to me, *which were not as stated here today,* but were such that I said, "Well, of course in my opinion with a plea entered if a plea of not guilty were withdrawn it would seem to me to be life." He asked me if I were called upon to sit in the case *based upon those facts would I be so inclined* and of course I said I would.

"Now, as we heard the testimony in this case with no explanation forthcoming from this defendant, *the facts in this case were not as stated by Mr. von Moschzisker's hypothetical question to me.* I think it is most unusual and I think it is to be regretted particularly in a case of such seriousness as this, but *in any event, if there is some insinuation that some deal was made or some commitment as to a decision before one has heard the facts, I think it is ridiculous.*

"MR. SPRAGUE: May I say this one response and that is all before asking your Honors to rule on this motion? Frankly I am very, very shocked to hear my good friend Mr. von Moschzisker, and also mention his associate, MR. MCBRIDE, indicating that *in a capital case* about to proceed that *they in effect had it fixed before it goes ahead.* It would be highly irregular for the Commonwealth to have spoken to any judge and ask him, 'Would you vote for the death penalty under any circumstances,' and I am frankly shaking with the shock to think that Mr. von Moschzisker, including in his statement the name of Mr. Mc-Bride, would think as reputable attorneys they would go on and *have in effect fixed a case beforehand.* I think that is *highly shocking, and I think that is what*

*it amounts to. It is no different to try to fix a juror than to try to fix a judge.* I ask your Honors to deny his motion at this time."

We agree with Mr. Sprague. Mr. von Moschzisker and Mr. McBride each testified under oath that *in the absence of the district attorney* he went to see one (McBride) or several (von Moschzisker) Judges, with the intention of obtaining from such Judge or Judges— whom they desired and solicited to sit in the Scoleri case—an *absolute commitment* (McBride) or the *equivalent of a commitment* (von Moschzisker) for a penalty of life imprisonment if Scoleri would plead guilty. *This conduct was indefensible and outrageous* and cannot be too strongly condemned.*

We all know how strongly Society disapproves and how severely the law punishes an attempt to fix a jury and it seems to us that, if anything, it is worse to fix or attempt to fix a Judge than to fix or attempt to fix a juror.

Von Moschzisker then filed, on behalf of Scoleri, a written petition for permission to withdraw Scoleri's plea of guilty, together with a rule to show cause. That lengthy petition contained 29 paragraphs and covered 14 printed pages. In the petition von Moschzisker stated that Judge REIMEL had *volunteered,* without being asked, to give Scoleri life imprisonment and that von Moschzisker "thinks that it was an honorable**

---

* Such conduct would likewise be indefensible in a civil case.

** Especially in view of the fact that Scoleri was a dangerous hardened criminal who had a prior criminal record of *25 armed robberies over a period of two months,* how a leading lawyer such as von Moschzisker could see nothing wrong with his attempts to solicit a Judge to give his client a sentence of life imprisonment, or could describe Judge REIMEL's alleged commitment as an "honorable and splendid thing for Judge REIMEL to have given"; or how such a leading lawyer as McBride could describe von Moschzisker's course as "very noble" and "a statesmanlike cutting of the Gordian knot" and "in the interests of justice", passes our comprehension.

and splendid** thing for Judge REIMEL to have given the assurance. . . ."

The petition further avers: "This created a situation in which [von Moschzisker] firmly believed that petitioner would receive life imprisonment if he entered a plea of guilty. This resulted from the facts that *Judge* REIMEL *had stated that he would vote for life imprisonment;* that Judge REIMEL still appeared to feel that way about the matter since he had accepted the Court Administrator's invitation to sit on the case; and the fact that under the three-judge rule as construed, Judge REIMEL'S vote was enough to require a sentence no more severe than life imprisonment.

"Accordingly, [von Moschzisker] after ascertaining that Judge SPORKIN would still have Judge KELLEY and Judge REIMEL sit with him on a guilty plea immediately conferred with petitioner, told him everything that had happened, *advised him that there had been no inducement to plead guilty and there had been no promise from the court itself of a life sentence* but that in the opinion of defense counsel petitioner's life would be almost absolutely safe if he changed his plea to guilty, the one qualification to this, as expressed by defense counsel to petitioner, being that if Judge REIMEL did not stand by what he had said to defense counsel, petitioner might receive the death penalty."

The petition concluded with the prayer that if the facts recited therein were not agreed to, petitioner requested a hearing with testimony on the disputed facts.

---

These self-serving, self-righteous and pseudo exculpatory statements cannot cover up or conceal or justify conduct which is indefensible and outrageous. If, as Mr. McBride and Mr. von Moschzisker testified, such a practice exists among some lawyers and some Judges in any of the criminal courts of Philadelphia County, it must be instantly and perpetually stopped!

The Commonwealth filed an answer in which it denied virtually all the material facts averred in the petition of which it had knowledge, but also averred it had no knowledge of what transpired at the secret conferences between von Moschzisker and any Judge. The answer incorporated an affidavit of Judge REIMEL. REIMEL'S affidavit stated, inter alia, *"I did not volunteer that if I sat on the case I would vote for life imprisonment, and I gave no promise to Michael von Moschzisker that I would do so.* The reason for this is quite obvious, as I could not and would not render a decision in this or any matter until I have heard all of the facts. *I therefore did not make any commitment, nor did I give any promise to Michael von Moschzisker. For him to say otherwise is untrue."*

### Testimony Concerning Scoleri's Right to Withdraw His Plea of Guilty

It is unnecessary to further summarize the petition since it was followed by the testimony of the persons mentioned therein.

Mr. von Moschzisker took the witness stand in order to support Scoleri's aforesaid oral motion and his written petition to withdraw his guilty plea. Von Moschzisker's testimony covered 110 printed pages.* Von Moschzisker testified that he went to see four Judges whom he believed were opposed to capital punishment, to discuss the case with them and ascertain their feelings about capital punishment, and *if any of them gave him confidence* that he would vote for life imprisonment if Scoleri pleaded guilty, he would then ask him whether he would be willing to sit as a member of the three-Judge Court.

---

* Many pages contained, not testimony but, numerous objections, discussions and legal arguments which often had no relevance to the basic question involved.

Despite von Moschzisker's protestations and evasions, we believe it is clear from his testimony that he was shopping around City Hall to find (a) a Judge who was against the death penalty and (b) would give him in effect a commitment** and (c) would agree to sit in the case. McBride had exactly the same purpose as he frankly admitted when he testified under oath that he went to see Judge CARROLL *for the express purpose of obtaining from him a commitment* to give Scoleri a life sentence. CARROLL, as we shall see, refused to give any commitment.

Von Moschzisker testified that he then went to see Judge REIMEL to ascertain his views on capital punishment and if favorable, whether he would sit if a guilty plea were entered. He told REIMEL about the very injurious effect the current newspaper publicity would have on Scoleri's case. He did not tell REIMEL about Scoleri's terrible prior record, but he testified he told him Scoleri had a bad record and also *told him the facts in the Scoleri case in a rather limited way:* "I told him [REIMEL] that in view of the situation created by the newspaper publicity I was considering what I hoped would be the possibility of saving Anthony

---

** One example: "Q. Would it be fair to say that you were really looking for a commitment from a judge in one form or another when you went to see these judges? A. It would be fair to say that if I got a commitment I would be the happiest lawyer in Philadelphia. It wouldn't be fair to say I was looking for a commitment, and I must explain that. *I don't think there is anything wrong in looking for a commitment* . . . I left Judge ULLMAN's chambers feeling pretty good, and I left Judge REIMEL's chambers surprised and exhilarated because without seeking a commitment from him and without my asking him for one he had said something I don't think any judge has done with me before. He came out in just so many flat words and gave me one, so I don't think it would be fair to say I sought a commitment, . . ."

"A. . . . I met . . . Mr. McBride [who] said to me with regard to Judge CARROLL, 'Well, he wouldn't give me any commitment. He said he wouldn't give me a commitment.' "

Scoleri's life by a guilty plea. At that point I believe. it was that Judge REIMEL spoke up, after I had mentioned the possibility of a guilty plea and said, *'I will tell you what I would do, Michael. I would give him life.'* . . . I then asked Judge REIMEL whether he would be willing to sit on the case if he was invited to. Just before that Judge REIMEL had added the statement to the effect that he and his fellow judges were more and more swinging toward the view that if one judge voted for life it couldn't be anything more than life—it couldn't be death—on a guilty plea. When I asked him whether he would be willing to sit if invited he answered in the affirmative. We talked a little bit more. Before I left . . . I remembered one thing more, and I turned to him and I said, 'There is one thing more I should tell you. I don't think it will change your mind, and that is that this is not one of those cases where [after] a guilty plea the assistant district attorney will remain quiet. Mr. SPRAGUE has told us if the plea is guilty he will still press vigorously for the death sentence. Does that make any difference?' He indicated to me that that fact would not change his attitude, that he would give this man life. . . ."

*"Judge* REIMEL *gave me a flat commitment that if Scoleri pleaded guilty he would give him life."*

Von Moschzisker further testified that he saw nothing wrong in anything he did in this case. This testimony of "a flat commitment" was in accord with von Moschzisker's statement to the Court in which he asked leave to withdraw Scoleri's plea, and it was in accord with his written petition for leave to withdraw Scoleri's plea, and it was in accord with his direct testimony. *However, this was contrary to his testimony on cross-examination* as to REIMEL's statement, as is apparent from the following where, in answer to a question whether REIMEL (in his statement) gave

him a commitment, he replied: "I would say that it is *not a flat commitment* of what penalty he [REIMEL] would insist upon imposing or insist upon having imposed. I would say it is a flat *commitment of what his inclination then was.* He says 'It would seem to me to be life' and then he said he would be *'so inclined.'* I think *that is a flat commitment that he was then so inclined.* I don't think it is more than sort of *a semi-flat commitment* of how he would vote. . . . *I do not consider this statement* [of REIMEL's] *to be such a flat commitment* [*of a vote*]." "Q. Aside from the consequences don't you agree that Judge REIMEL could not make any commitment at all if the facts were different from those you represented to him? A. No, I don't agree."

Von Moschzisker did not tell Scoleri that he had "a flat commitment." "*I was looking for a feeling of confidence.*"

Furthermore, VON MOSCHZISKER'S direct testimony that Judge REIMEL gave him a flat commitment (1) *was contrary* to Judge REIMEL's statements from the bench at the time von Moschzisker moved to withdraw Scoleri's plea; and (2) *it was contrary* to Judge REIMEL's subsequent affidavit; and (3) *it was contrary* to Judge REIMEL's testimony; and (4) *it was contrary* to the testimony of Colbert McClain, Esq. who was Scoleri's counsel at the first trial; and (5) *it was contrary* to the testimony of Assistant District Attorney Richard Sprague.

Judge REIMEL, in his affidavit and in his testimony, *denied that he had ever volunteered and also denied that he had ever promised to give Scoleri life.* His pertinent testimony is: ". . . when we had announced our unanimous decision and the death penalty was about to be imposed and Mr. von Moschzisker spoke up, *I was stunned.* I had no reason to recall any conversation with him. I decided the case based upon

the evidence that was presented to us. *We had no difficulty in arriving at our decision, . . .* Q. Was there any indication at the time that you talked to Mr. von Moschzisker that you would be called upon to sit as a judge? A. No, no indication at all. . . . Q. *Did you make any promise or commitment to him of any sort?* A. *No.* Q. That you would vote for life imprisonment? A. *No,* he may have had that in mind, but I certainly didn't. . . . Q. . . . *Would you ever make a commitment under any circumstances—* A. *I don't only state that I never would. I never have.* Q. *With only one counsel present?* A. *No, definitely not."*

REIMEL further testified on cross-examination that the facts stated to him by von Moschzisker had "no familiarity and ring with the facts I had heard from the witness stand [von Moschzisker's testimony]" and they "were different . . . *in most every respect."*

It is very difficult to believe that any Judge, even if he did not possess Judge REIMEL's splendid reputation, would have "volunteered," let alone promised ex parte, to give any criminal with Scoleri's record a sentence of life imprisonment for this planned, armed robbery and brutal murder which was committed by a man who had perpetrated 25 armed robberies in a period of two months.

Mr. McBride represented Scoleri in the trial of this case after von Moschzisker presented his written petition for leave to withdraw Scoleri's guilty plea. It is regrettable that McBride while actively conducting Scoleri's case, took the witness stand and, over the objection of the assistant district attorney, but with the permission of the Court,* testified in this case.

---

* Mr. McBride had strenuously objected to the right of Mr. Sprague, the Assistant District Attorney, to be both counsel and witness in this proceeding because it violated the Canons of Professional Ethics. McBride's objection was sustained by the Court

McBride testified about his views or "diatribe against the death penalty which was printed in the Pennsylvania Bar Association Journal" and because of this background, went to see CARROLL about this Scoleri case.** "And then being of that opinion, and having had this, as I call it, a *statesmanlike cutting of the Gordian knot* by Judge CARROLL in the other case, I said to Mr. *von Moschzisker* that I would like to go over—he didn't object—and talk to Judge CARROLL about this case and see whether he didn't feel that *the interests of justice* would be better served if the same course was pursued in the Scoleri case as was pursued in the Almeida case,*** . . . so I told him the rea-

---

and the Commonwealth's case was conducted by Mr. Arlen Specter. We can see absolutely no difference or distinction between the position of Sprague and that of McBride, or any justification for the different rulings of the Court. Canon 19 of Professional Ethics prohibits or restricts counsel from being both counsel and witness, and this Court has repeatedly condemned such practice in the absence of very unusual circumstances: *Coulter Estate*, 406 Pa. 402, 178 A. 2d 742; *Otto Will*, 349 Pa. 205, 211, 36 A. 2d 797.

** McBride testified, although we cannot see its relevance, that he had seen Judge CARROLL *with no one else present*, at a time when he was counsel for Almeida, and that CARROLL *had agreed to give Almeida life* imprisonment if he pled guilty, and that Almeida had received from a three-Judge Court life imprisonment. McBride said that in making this promise and in giving Almeida life, CARROLL was "eternally right that he did what he did"; and that there was nothing "dirty" in this procedure; and that it was a practice which had been indulged in by district attorneys, assistant district attorneys, and Philadelphia Judges for about 35 years.

*** Judge CARROLL later took the witness stand and vigorously denied he had ever seen McBride *alone* about the Almeida case, and *vigorously denied he had ever promised* McBride or anyone to give Almeida life imprisonment. To support his testimony CARROLL produced notes of the conference he had had concerning the Almeida case, at which Mr. Dilworth, Mr. Panati and Mr. McBride were present. He then testified that McBride knew he, CARROLL, had never made any such promise. Whereupon McBride shouted from the counsel table that he knew CARROLL had made such a promise. This was a collateral matter which should never have been brought into the Scoleri case, and reflected no credit upon

sons I was coming to see him.  He said, '*I can't give you a commitment to do anything.*' . . . Q. Did you ask Judge CARROLL for a flat promise such as the one you say you had obtained in the Almeida case?  A. My recollection is that I did not, but *I went there for the deliberate purpose of obtaining such a flat promise if I could possibly obtain it.*  Q. With that purpose in mind then, why did you not ask for that flat promise? A. I think he before I ever got to that point said he would not give me one."

We then come to the most important and the most crucial questions: What did von Moschzisker tell Scoleri and what did Scoleri rely upon when he changed his plea to guilty?  The testimony in important respects is so uncertain, contradictory and conflicting that it is almost impossible to answer these questions with any certainty.

We have reviewed and summarized most of von Moschzisker's testimony.  Subsequently he testified that as a result of his interview with REIMEL, "When I did tell Mr. Scoleri about my visit to Judge REIMEL it was later on, and other events had transpired in the meantime."

"I think during this interval I went to check with brother Scoleri and told him . . . this 11 to 1 [jury] business mentioned by Judge KELLEY sounded to me like he was almost saying that the interpretation I wanted [one Judge vote for life] would prevail. . . . I told Scoleri that by processes of sort of inferences I thought we might be safe changing the plea, but I didn't think it was clear enough to take such a big step and he agreed with me."

---

counsel's conduct of the Scoleri case.  Justice is not a one-way street—one-way for the criminal only; Justice means equal justice for all under an impartial administration of the law.  Justice is a two-way street in which Justice means justice for society as well as for the criminal.

"I went to see Scoleri . . . described again my conversation with Judge REIMEL, told him what I had just heard indirectly about Judge SLOANE'S view [if it is two for death and one for life he can't get death]. . . and told him that in view of the conversation I had with Judge REIMEL whom I had found in the past to be a good man of character and some courage, that I thought it would be safe for him to change his plea. . . . I had said to him . . . that everything in life was uncertain, and we couldn't dismiss the possibility that . . . the judge might not stand by. Judge REIMEL might not stand by *what he had flatly stated to me* and it was possible he could still get the death penalty."

". . . He, with some reluctance, agreed and I went back and told Mr. SPRAGUE and Judge SPORKIN that he had agreed."

(Cross-examination of von Moschzisker as to REIMEL'S statement from the bench after von Moschzisker's oral request to withdraw Scoleri's plea)

"A. I would say that it is not a flat commitment of what penalty he [REIMEL] would insist upon imposing or insist upon having imposed. I would say it is a flat commitment of what his inclination then was. . . . I think that is a flat commitment that he was then so inclined. I don't think it is more than sort of *a semi-flat commitment* of how he would vote. Q. Mr. von Moschzisker, you characterized it on both sides of the coin, flat and semi-flat. Now can you stand on one or the other? Is it a flat commitment or isn't it a flat commitment? A. Understanding you to mean as I think you mean, a flat commitment of what generally he would insist on fixing in the Court, a flat commitment of what penalty he would insist on fixing in Court if he sat, I answer very easily *I do not consider this statement . . . to be such a flat commitment."*

"Q. You explained all of these things to Mr. Scoleri in coming to a conclusion with him as to what course he should take? A. *Certainly not. Judge* REIMEL *hadn't said these things at the time I talked to Mr. Scoleri,* referring to the affidavit and the transcript, when I mean 'These things.'. . . Q. So you didn't tell Mr. Scoleri you had a flat commitment? A. I didn't, as well as I can remember, use the word 'flat' or use the word 'commitment.'. . . Q. Aside from the consequences don't you agree that Judge REIMEL could not make any commitment at all if the facts were different from those you represented to him? A. No, I don't agree."*

"Q. You were present of course, Mr. von Moschzisker, when questions were asked by Mr. Sprague as to whether or not—I'd better read it. 'MR. SPRAGUE: You understand that *no promises of any sort have been made concerning the entry of a plea by you?* You understand that in the event you are found guilty by a Court composed of three judges of first degree murder *you can get death in the electric chair?* THE DEFENDANT: Yes, I do.' . . . A. The answer is I was present when these questions that were asked of Mr. Scoleri were asked and when he gave his answers. . . . I at first considered it to be of some importance. Upon reading it a second time it seemed to me that *it doesn't make a great deal of sense.* . . . Q. When Mr. Scoleri entered a plea of guilty to murder generally was he entering an honest plea based on what he told you? A. First of all I must answer that I don't regard pleas as matters of honesty. *I think it is honest for guilty people to plead not guilty. . . ."*

---

* "Q. You testified yesterday Mr. von Moschzisker, that *there was nothing wrong with getting a deal or a commitment from a judge in advance;* that is correct, isn't it? A. I believe I did so testify. In any event *I so believe.*"

Scoleri thereupon took the witness stand and testified as follows: "BY MR. MCBRIDE: Q. Mr. Scoleri, I shall not tread upon any of the matters involving your guilt or innocence in this case, and *I don't want you to tread upon them either.* I am sure the Commonwealth won't. We have a very particular issue here to go over with you. Were you in Court when Mr. von Moschzisker testified as to what he told you prior to your changing of your plea? A. Yes, I was."

In this testimony which was the most crucial in the entire case, Scoleri was improperly asked highly leading questions. Instead of being asked "What, if anything, did von Moschzisker tell you?"; and later "What induced you to change your plea?"—he was asked: "Q. *Did he tell you prior to changing your plea what he said on that witness stand he told you?* A. Yes, he did. Q. Were you agreeable in the first instance to changing your plea at all? A. No, sir. Q. When was it and upon what basis did you agree that Mr. von Moschzisker could state to the Court that you were changing your plea? A. *It was only after he had assured me that he had some kind of assurance or an understanding with Judge* REIMEL that I changed the plea, that I was willing to change the plea. Q. Did he go over with you the situation involved in what has been discussed of a two to one vote? A. Yes, he did. Q. Did he tell you what his view about that was? A. Yes. Q. *Was that view that he told you the same as he testified to here?* MR. SPECTER: Objection on the ground of leading. JUDGE KELLEY: It is leading, but we have to allow a certain amount of leading around here. Otherwise we will be here for a week. BY MR. MCBRIDE: Q. What is the answer, Mr. Scoleri? A. The answer is *substantially yes.* Q. Would you change your plea from not guilty, which you had heretofore entered, to guilty

had you not had this assurance from Mr. von Mosch-zisker? A. Definitely not."*

The present situation has been made even more difficult of a just solution, by additional facts and factors which will be hereinafter set forth.

Colbert McClain, a leading member of the Philadelphia Bar, who had *represented Scoleri in his first trial,* testified as follows: When he saw Judges REIMEL, KELLEY and SPORKIN in the Courtroom and having been an assistant district attorney for seven years and "Having had some slight experience with such cases as these, as this one here before the Court, I said to Mike, [von Moschzisker], 'Mike, it looks like you have a commitment.' He said, *'No, I haven't.'* I said, *'Haven't you any deal to save this man's life?* I see three-two other judges. It looks like there is going to be a plea and perhaps you have been more successful than Mr. King and myself. Haven't you saved his life?' He said, *'Absolutely no deal at all.'* "

Richard Sprague, assistant district attorney, testified (page 468a) that he said to Mr. von Moschzisker: "While I don't object to any judge sitting in the case I don't want there being a commitment in this case. It is my recollection that Mr. von Moschzisker said 'No judge would give an advance commitment.' Judge SPORKIN said, 'Of course not.' "

Judge REIMEL withdrew as a Judge in this case when he took the witness stand and testified—leaving a two-Judge Court. Thereafter Judge SPORKIN and Judge KELLEY disagreed as to the disposition of Scoleri's petition to withdraw his guilty plea. Judge

---

* "Judge SPORKIN: Did he say that Mr. von Moschzisker had a conversation with me and that I agreed to grant a new trial in the event Judge REIMEL double crossed him? Mr. McBride: He has admitted he is probably mistaken about that. The Witness: I have said I am mistaken about that."

SPORKIN found that Scoleri was guilty of "reprehensible deception" and said:

"The trial Judge concludes that the evidence in this case does not warrant a finding there was a commitment by Judge REIMEL, prior to the change of plea to guilty, to counsel for defendant, that if selected to be a member of the panel, he would vote for life imprisonment.

"Moreover, it is clear that defendant was under no misapprehension as to the possible consequences that might flow from the entry of a plea of guilty.

"By defendant's own admission, when he testified before us at the hearing on the present motion, he understood that even though he would enter a plea of guilty, he would still run the risk of being sentenced to death. So that, in my view, *we do not have here a plea of guilty induced either by a commitment or promise, or based upon a misapprehension as to the consequences which might be incurred by the entry of such a plea.*

"Second, the record is crystal clear that when defendant at the bar of the Court expressed his intention to change his plea, he *was extensively questioned by both Mr. Sprague and the trial Judge, and defendant made it abundantly plain that his change of plea was not predicated upon any promise, representation or commitment that he would receive a penalty of less than death,* if the adjudication was that of murder of the first degree."

Judge KELLEY disagreed because: "To me the following are significant facts:

"First: Judge REIMEL and defense counsel had a private discussion, as a result of which the defense counsel concluded that the judge would be willing to give life imprisonment in the case then pending.

"Second: defense counsel told his client, the defendant, that the judge had promised life imprison-

ment* and that the judge's vote alone was sufficient to guarantee life imprisonment.*

"Third: the defendant changed his plea to guilty to murder generally in reliance upon defense counsel's assurance and representations.

"Fourth: the defendant stated in open Court the death penalty might be imposed."

When Judge REIMEL took the witness stand and became a witness—after a three-Judge Court of which he had been a member, had unanimously imposed a sentence of death on Scoleri—it was equivalent to his withdrawing as a Judge from the case. It was therefore both irrelevant and unwise for him to state in chambers—as Judge KELLEY, in effect, says he did— that if he were still sitting as a Judge he would allow the defendant to withdraw his guilty plea because von Moschzisker apparently misunderstood him.** It is difficult to understand REIMEL's changed position, in view of the fact that sitting as a Judge in this case, Judge REIMEL had imposed a sentence of death on Scoleri *and had several times sworn that he had never promised nor given von Moschzisker a commitment to impose a penalty of life imprisonment,* and for von Moschzisker to have said the opposite was "untrue and ridiculous."

The lower Court which, we repeat, was composed of two Judges, entered an Order staying execution of judgment of sentence. From this Order the Commonwealth took this appeal. The lower Court—one Judge favoring and the other Judge opposing—also

---

\* In our opinion, this conclusion is not supported or justified by the record.

\*\* The record shows that Judge KELLEY said: "As I said earlier, I believe that while Judge REIMEL did not sit with this Court on these motions, nevertheless he was familiar with what went on here. He gave his opinion to the members of this Court that there was a misunderstanding and that he felt that the motion for the defendant should be granted, and I agree with him."

entered an Order denying defendant's petition and rule to withdraw his plea of guilty. From this Order and from the judgment of sentence defendant took this appeal.

## Double Jeopardy

Scoleri contends that he cannot now be convicted of murder, first, because the United States Court of Appeals for the Third Circuit so decided, and secondly, because of the Constitutional prohibition against double jeopardy. These contentions are utterly devoid of merit.

At the first trial the jury found Scoleri guilty of first degree murder with penalty of death. After the Court had entered a judgment of sentence of death, Scoleri took an appeal to this Court.

Scoleri contended, inter alia, (1) that the trial Judge should not have proceeded with the trial after Scoleri had slashed his wrists during the trial—(it can be reasonably assumed in an attempt to commit suicide); (2) that the trial Judge erred in instructing the jury (a) on reasonable doubt, and (b) on the defense of alibi; and (3) Scoleri's record of 25* prior armed robberies (in a period of two months) of which he had been convicted, was improperly admitted in evidence because the Split Verdict Act of December 1, 1959, (P. L. 1621, §1) should have been applied *retroactively* to a crime committed August 28, 1958. Scoleri's conviction and the sentence and judgment were affirmed by this Court on April 14, 1960, in *Commonwealth v. Scoleri*, 399 Pa. 110, 160 A. 2d 215. Certiorari was denied by the Supreme Court of the United States, *Scoleri v. Pennsylvania*, 364 U.S. 849.

---

\* In the present appeal he contends that he only committed 15 or 16 armed robberies in two months, because some of the hold-ups included two or three victims.

Thereafter Scoleri filed an application for a writ of habeas corpus in the United States District Court for the Eastern District of Pennsylvania; the writ was denied, 198 F. Supp. 872. Scoleri then appealed that Court's decision to the United States Court of Appeals for the Third Circuit. That Court held in *United States ex rel. Scoleri v. Banmiller*, 310 F. 2d 720 (in a four to three decision) that Scoleri had been deprived of his Constitutional rights because—prior to the enactment in Pennsylvania of the Split Verdict Act of 1959—Pennsylvania's established law, which permitted the introduction of defendant's prior criminal record for the purpose of enabling the jury to fix a just penalty, constituted a denial of due process.

However, contrary to Scoleri's contention, that *Court* said (pages 725-726): "The judgment of the court below will be reversed with the direction to grant the writ of habeas corpus. The Superior Court of Pennsylvania has held that no issue of double jeopardy can be raised under the circumstances. Commonwealth v. Townsend, 167 Pa. Super. 71, 76-77, 74 A. 2d 746, 749 (1950), certiorari denied, Townsend v. Burke, 340 U.S. 915, 71 S. Ct. 286, 95 L. Ed. 661 (1951). *Scoleri may therefore be promptly retried by the Commonwealth.* The 'Split-Verdict Act' of December 1, 1959, 18 P.S. §4701 (Supp.), will, of course, be applicable."*

The question of double jeopardy has been often raised in Pennsylvania in cases similar to the instant one and has always been decided adversely to Scoleri: *Commonwealth v. Melton*, 406 Pa. 343, 178 A. 2d 728; *Commonwealth ex rel. Patrick v. Banmiller*, 398 Pa. 163, 157 A. 2d 214; *Commonwealth v. Green*, 396 Pa. 137, 151 A. 2d 241; *Commonwealth ex rel. Farrow v. Martin*, 387 Pa. 449, 127 A. 2d 660; *United States v.*

* Certiorari was denied by the Supreme Court of the United States.

*Ball,* 163 U.S. 662; *Stroud v. United States,* 251 U.S. 15. Cf. *Commonwealth v. Baker,* 413 Pa. 105, 196 A. 2d 382.

In *Commonwealth v. Melton,* 406 Pa., supra, the Court said (pages 346-348):

"In Commonwealth ex rel. Patrick v. Banmiller, 398 Pa., supra, the Court said (pages 164-165): 'A defendant who has been convicted and who has secured a reversal of the judgment of conviction, either on appeal or by the granting of a writ of habeas corpus requiring a new trial, cannot secure his full release. The relator, by applying for the reversal, has waived his protection against being prosecuted again which the provision against double jeopardy (Pa. Const., Art. I, §10) affords him. Relator was not put in jeopardy a second time, since it was only the second trial that resulted in a valid sentence. [Commonwealth v. Lutz, 200 Pa. 226, 49 Atl. 771] Commonwealth ex rel. Farrow v. Martin, 387 Pa. 449, 127 A. 2d 660 (1956); Commonwealth ex rel. Walker v. Banmiller, 186 Pa. Superior Ct. 338, 142 A. 2d 758 (1958); P.L.E., Criminal Law §116.' Cf. also Gori v. United States, 367 U.S. 364. . . .

" 'Petitioner may not by his own voluntary action seek and obtain a reversal of judgment, and thereupon take advantage of such reversal to secure full release from punishment properly imposed as a sentence, upon legal conviction at the trial he so obtained. As has been held, relator has waived any benefit of the provision against double jeopardy in order that he might obtain the greater benefit of a review and reversal of his conviction and sentence by the Court. See People ex rel. Hunt v. Warden of New York City Prison, 107 N.Y.S. 2d 136; 22 C.J.S., Criminal Law, §273. *To hold otherwise would result in a travesty upon justice.*' "

Scoleri also relies upon *Fay v. Noia,* 372 U.S. 391. That case does not change the law, or aid Scoleri on

the point here involved. In that case, the Supreme Court of the United States affirmed the Order of the Circuit Court in *United States ex rel. Noia v. Fay,* 300 F. 2d 345, which states, "The order of dismissal [of the writ of habeas corpus] is reversed and the case remanded to the District Court with instructions to issue the writ and to order that the prisoner's conviction be set aside and that he be discharged from custody *unless forthwith accorded a new trial."*

We agree with Scoleri that:

(1) The granting or refusal of an application for leave to withdraw a plea of guilty (or not guilty) is a matter of judicial discretion; and it will not be reversed in the absence of a clear abuse of discretion or an error of law which controlled the lower Court's decision: *Commonwealth v. Kirkland,* 413 Pa. 48, 195 A. 2d 338; *Commonwealth v. Senauskas,* 326 Pa., supra; *Commonwealth v. Green,* 396 Pa., supra; *Commonwealth v. Cole,* 384 Pa., supra; *Commonwealth ex rel. O'Neil v. Ashe,* 337 Pa. 230, 10 A. 2d 404; *Commonwealth v. Shawell,* 325 Pa. 497, 191 A. 17.

(2) *The withdrawal of a plea of guilty is properly allowed* (a) where it has been entered in ignorance of the nature of the crime with which defendant has been charged and the consequences of his plea, or (b) where the plea of guilty was not made freely and voluntarily, or (c) where the plea was entered by mistake, or without the consent of the defendant, or (d) where the plea was entered by an uncounseled defendant in a homicide case, or in a felony case in which defendant was indigent or was refused counsel. (Cf. *White v. Maryland,* 373 U.S. 59; *Hamilton v. Alabama,* 368 U.S. 52; also, *Gideon v. Wainwright,* 372 U.S.), or (e) where the plea was induced by fraud or threats or justifiable fear, or (f) where a trial or hearing Judge has made, but has not kept, a promise or commitment which induced the plea, or (g) where because of very unusual circum-

stances, the Court believes that Justice will best be served by submitting the case to a jury: *Commonwealth v. Kirkland*, 413 Pa., supra; *Commonwealth v. Todd*, 186 Pa. Superior Ct. 272, 142 A. 2d 174.

(3) However, *there is no legal justification for the withdrawal* of a plea of guilty which is entered (a) under the belief that as a result of such plea he will receive life imprisonment or lenient treatment, or (b) where he and his lawyer had erroneously drawn the conclusion that he will not receive a penalty of death or a severe penalty, or (c) where his lawyer and the district attorney have agreed upon the exact crime which he has committed and the penalty to be imposed: *Commonwealth v. Kirkland*, 413 Pa., supra. Cf. also, *Commonwealth v. Baker*, 413 Pa. 105, 196 A. 2d 382; *Commonwealth ex rel. Johnson v. Rundle*, 411 Pa. 497, 192 A. 2d 381; *Commonwealth v. Green*, 396 Pa., supra.

We agree with the Commonwealth that—contrary to Scoleri's contention—where three Judges hear a guilty plea in a homicide case, and one votes for a life sentence and the other two vote for death, a death sentence is valid: *Commonwealth v. Cole*, 384 Pa. 40, 119 A. 2d 253. Cf. also, *Commonwealth v. Petrillo*, 340 Pa. 33, 16 A. 2d 50, where a death penalty was affirmed on a sentence entered by the two surviving Judges of a three-Judge Court.* We note that the affirmance of a death sentence is rarely ever unanimous; this Court has occasionally affirmed a death sentence on a four to three vote. See, for example, *Commonwealth v. Cater*, 402 Pa. 48, 166 A. 2d 44.

The law is well summarized in *Commonwealth v. Kirkland*, 413 Pa., supra, where the Court pertinently said (pages 54-57): "Section 1 of the Act of April 15, 1907, as amended by the Act of June 15, 1939, supra, pertinently provides 'that the defendant may withdraw

---

* The Court had heard no testimony but had merely read the record.

his plea of guilty at any time before sentence, by leave of the Court.' This proviso has always been construed as vesting the trial Judge with discretion to allow or deny the withdrawal of a guilty plea, subject to review on appeal . . . [citing cases].

"In Commonwealth v. Senauskas, 326 Pa., supra, the Court aptly said (pages 71-72, 73) : 'It may be stated generally that for a judge to make a bargain, engagement or promise in advance of the hearing of a case irrespective of what the evidence might thereafter show the facts to be and as to what judgment he should render therein, would be *judicial misconduct.* Such agreements have uniformly been held to have no binding effect, and they are incompatible with the powers or duties of a judicial officer. The failure of a judge, who enters into an agreement of this type, to comply with his promise gives to the defendant the right to withdraw his plea of guilty and enter a plea of not guilty, under the theory that the plea of guilty is not binding upon a defendant when induced by fear, promises, [improper] persuasion or ignorance. . . .

" 'To avoid possible imposition on the courts by petitions of the character now before us, . . . *allegations of such [judicial] misconduct should be clearly proved* to warrant the fastening of discredit upon any judicial officer. . . .

" 'Counsel for the defendant advanced the further argument that the withdrawal of the plea of guilty should be permitted regardless of any promise. The granting of an application for leave to withdraw a plea is a matter of judicial discretion: Commonwealth v. Di Paul, 122 Pa. Superior Ct. 53. The reason assigned here, that counsel believed there was an understanding with the court, is not sufficient to permit the withdrawal, especially since the hearing judge has found that no such promise existed. . . .' "

". . . the withdrawal of the plea of guilty should not be denied in any case where it is apparent that the

ends of Justice will be served by permitting not guilty to be pleaded in its place.

. . .

"The fact that in the finding of the Court as to the degree of defendant's guilt and the sentence imposed, the expectations or hopes of appellant and her counsel were not realized is not the kind of 'mistake or misapprehension' which in the interest of Justice, justifies the withdrawal of a plea of guilty.

" '. . . Where an accused pleads guilty, relying on his attorney's opinion as to the probable Commonwealth recommendation or actual sentence, he will not be permitted later to withdraw his plea on the ground that he was ill advised. Commonwealth v. Green, 396 Pa. 137, 143, 144, 151 A. 2d 24 (1959).' "

If von Moschzisker had told Scoleri (a) that Judge REIMEL had made *an absolute commitment* to impose only a life sentence, and (b) that this would probably be sufficient in law to prevent the other two Judges from validly imposing the death penalty, and Scoleri changed his plea in reliance upon this, Scoleri would have the right to withdraw his plea upon failure of Judge REIMEL to keep his commitment.

It is exceptionally difficult, because of the evasive, contradictory and at times directly conflicting testimony which permeates this case, to decide whether Scoleri should be permitted to withdraw his plea of guilty. It is almost impossible to determine (a) *exactly* what von Moschzisker believed, and (b) *exactly* what he told Scoleri, and (c) what Scoleri, whose testimony is unworthy of belief, relied upon when he pleaded guilty. Although Scoleri has failed to satisfy his burden of proof, and "witness" REIMEL's subsequent change of mind (apparently expressed to Judge KELLEY and Judge SPORKIN "in chambers") is of no legal significance, we have decided, principally because of the view of Judge KELLEY and the changed view of Judge

REIMEL, to permit Scoleri to withdraw his plea of guilty.

We regard this case as sui generis. In view of the very unusual facts and circumstances hereinabove recited, a new trial is hereby Ordered, and it must be held (a) promptly and (b) by a jury and not by a Judge or a three-Judge Court.

The Order staying execution is affirmed; the Order denying the withdrawal of Scoleri's guilty plea is reversed, and a new trial is ordered consistent with this Opinion.

Mr. Justice JONES, Mr. Justice COHEN and Mr. Justice EAGEN concur in the result.

---

ORDER PER CURIAM, September 8, 1964:

AND NOW, to wit, this 8th day of September, 1964, upon consideration of the petition filed September 2, 1964, requesting modification of our Order entered in the above matter July 1, 1964, we are of the opinion that the petition is without merit. It is premature. In the Court below, no guilty plea has been offered, made or entered by the petitioner. Nor has such a plea been considered, accepted or refused by the trial Court.

Our previous Order directing a prompt new trial before a jury and not by a Judge or a three-Judge Court was entered because of the then existing posture of the case. The defendant had appealed from the refusal of the Court below to allow him to withdraw his plea of guilty, and we were of the opinion that such withdrawal should have been permitted. In consequence, the defendant was entitled to have the case restored to the status which existed prior to his plea, i.e., entitled to trial by jury. Our Order had this effect.

The addendum directing a speedy trial before a jury was merely definitive of the rights possessed by

the defendant at the time our Order became effective. Clearly that Order does not preclude petitioner from entering a plea of guilty if he so desires.

Should a guilty plea be offered, its acceptance or rejection would be within the sound discretion of the trial Court, determined upon careful consideration of the circumstances then before it. In the event such a plea is properly made and accepted, the trial Court will proceed in accordance with the applicable law and the Rules of Court.

Now, THEREFORE, the prayer of the petition is denied and the petition is dismissed.

Mr. Chief Justice BELL joins in the Per Curiam Order but adds: "I would go further and hold that this Court has the inherent power, and in unusual cases should exercise this power to order a trial by a jury instead of by a Court whenever in its carefully considered judgment the protection of society or the interests of Justice require it. The records in the cases of Commonwealth v. Scoleri reveal beyond any doubt the wisdom if not the necessity in the interest of Justice of a speedy jury trial in this case."

Mr. Justice MUSMANNO and Mr. Justice COHEN took no part in the consideration or formulation of this Court's Order.